# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TEAMSTERS UNION 25 HEALTH SERVICES & INSURANCE PLAN, on behalf of itself and all other similarly situated stockholders of ORBITZ WORLDWIDE, INC., and derivatively on behalf of nominal defendant ORBITZ WORLDWIDE, INC., | ) ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 9503-CB |
| GAVIN BAIERA, MARTIN J. BRAND, MARK S. BRITTON, JEFF CLARKE, KENNETH S. ESTEROW, SCOTT FORBES, ROBERT L. FRIEDMAN, BRADLEY T. GERSTNER, BARNEY HARFORD, KRISTINA M. LESLIE, TRAVELPORT LIMITED, TRAVELPORT LP, TRAVELPORT GLOBAL DISTRIBUTION SYSTEM, B.V., TDS INVESTOR (LUXEMBOURG) S.A.R.L., WALTONVILLE LIMITED, TRAVELPORT HOLDINGS LIMITED, and THE BLACKSTONE GROUP LP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ORBITZ WORLDWIDE, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## OPINION

Date Submitted: April 15, 2015
Date Decided: July 13, 2015

Christine S. Azar and Ned Weinberger of LABATON SUCHAROW LLP, Wilmington, Delaware; Christopher J. Keller, Eric J. Belfi and Michael W. Stocker of LABATON

SUCHAROW LLP, New York, New York; Jeremy Friedman and Spencer Oster of FRIEDMAN OSTER PLLC, New York, New York; *Attorneys for Plaintiff.*

Anne C. Foster and Christopher H. Lyons of RICHARDS, LAYTON & FINGER P.A., Wilmington, Delaware; Elizabeth Herrington of MCDERMOTT WILL & EMERY LLP, Chicago, Illinois; John A. Sten of MCDERMOTT WILL & EMERY LLP, Boston, Massachusetts; *Attorneys for Orbitz Worldwide Inc., and Gavin Baiera, Martin J. Brand, Mark S. Britton, Jeff Clarke, Kenneth S. Esterow, Scott Forbes, Robert L. Friedman, Bradley T. Gerstner, Barney Harford and Kristina M. Leslie.*

Martin S. Lessner, Elena C. Norman and Paul J. Loughman of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Joseph Serino, Jr., P.C. and Matthew Solum of KIRKLAND & ELLIS, New York, New York; *Attorneys for the Travelport Defendants and The Blackstone Group LP.*

**BOUCHARD, C.**

## I. INTRODUCTION

In this action, a stockholder of Orbitz Worldwide, Inc. ("Orbitz" or the "Company") challenges the fairness of the terms of a five-year services agreement (the "New Agreement") the Company entered into in February 2014 with a group of entities affiliated with Travelport Limited (as defined below, "Travelport"). Plaintiff alleges that Travelport owned approximately 48% of Orbitz and thus controlled the Company when it negotiated and signed the New Agreement.

Plaintiff has asserted four derivative claims challenging the New Agreement. Its two primary claims are that Travelport breached its fiduciary duty as a controlling stockholder by causing the Company to enter into the New Agreement on unfair terms, and that Orbitz's directors breached their fiduciary duties by approving the New Agreement. Plaintiff also asserts two related derivative claims for unjust enrichment and aiding and abetting. Separately, plaintiff asserts a putative class claim for breach of fiduciary duty against Orbitz's directors for allegedly violating the rules of the New York Stock Exchange. Defendants moved to dismiss plaintiff's claims under Court of Chancery Rule 23.1 for failure to make a demand or to adequately plead demand is excused and under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

In this opinion, I conclude that demand is not excused as to any of plaintiff's derivative claims because plaintiff has failed to raise a reasonable doubt that at least half of the directors on Orbitz's board when this action was filed could have exercised impartial business judgment in responding to a demand. In analyzing this issue, I apply

1

the *Rales* test for the reasons explained below, but I would reach the same conclusion under the *Aronson* test. Significant to the analysis, I reject plaintiff's assertion that demand should be excused simply because an alleged controlling stockholder stood on both sides of the New Agreement. As explained below, this theory is inconsistent with Delaware Supreme Court authority that focuses the test for demand futility exclusively on the ability of a corporation's board of directors to impartially consider a demand to institute litigation on behalf of the corporation—including litigation implicating the interests of a controlling stockholder. For these reasons, and the others explained below, I grant defendants' motions to dismiss.

## II.   BACKGROUND[1]

### A.   The Parties

Nominal Defendant Orbitz Worldwide, Inc., a Delaware corporation based in Chicago, Illinois, is an online, travel company. It operates the websites known as Orbitz.com, ebookers, HotelClub, and CheapTickets.

Defendants Travelport Limited, Travelport LP, Travelport Global Distribution System, B.V., TDS Investor (Luxembourg) S.a.r.l., Waltonville Limited, and Travelport

---

[1] Unless noted otherwise, the facts recited in this opinion are based on the well-pled allegations of the Verified Second Amended Stockholder Class Action and Derivative Complaint (the "Complaint"). At times, I rely upon certain extraneous documents that are properly before the Court because they are integral to Plaintiff's claims and incorporated by reference into the Complaint. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995). Those documents were attached as exhibits to two affidavits submitted by counsel for Orbitz and its directors (collectively, the "Orbitz Defendants"). I refer to the affidavit dated December 4, 2014, as "Lyons Aff. I" and to the affidavit dated March 9, 2015 as "Lyons Aff. II."

Holdings Limited (collectively, "Travelport" or the "Travelport Defendants") provide transaction processing services to travel companies, including Orbitz. Each of the Travelport Defendants "is a beneficial owner of Orbitz common stock or a party to" the New Agreement.[2]

Defendant The Blackstone Group LP ("Blackstone") is an investment and advisory firm. Until an April 2013 refinancing, Blackstone held a majority interest in Travelport. As of February 4, 2014, the date of the New Agreement, Blackstone owned approximately 13% of Travelport. As of November 18, 2014, the date of the Complaint, Blackstone owned approximately 7% of Travelport.[3]

Defendants Martin J. Brand, Mark S. Britton, Jeff Clarke, Kenneth S. Esterow, Scott Forbes, Robert L. Friedman, Bradley T. Gerstner, Barney Harford, and Kristina Leslie and non-party Jaynie Studenmund were the ten members of Orbitz's board of directors when the Company entered into the New Agreement on February 4, 2014 (collectively, the "Agreement Board"). At the time, Britton, Leslie, and Studenmund were the three members of Orbitz's Audit Committee. On February 7, 2014, Studenmund resigned from the Orbitz board. Her former board seat remained vacant when the Complaint was filed.

Brand, Britton, Clarke, Esterow, Forbes, Friedman, Gerstner, Harford, and Leslie were the nine members of Orbitz's board of directors when Plaintiff initiated this action

---

[2] Compl. ¶ 30.

[3] *Id.* ¶ 47.

on April 3, 2014 (the "Demand Board"). On April 10, 2014, Clarke resigned as an Orbitz director, and the board appointed Defendant Gavin Baiera to fill the vacancy created by that resignation.

Baiera, Brand, Britton, Esterow, Forbes, Friedman, Gerstner, Harford, and Leslie are currently the nine members of Orbitz's board of directors (collectively, the "Current Board"). The table below reflects the composition of the Orbitz board at the relevant times.

| Composition of the Orbitz Board of Directors | | |
|---|---|---|
| Agreement Board | Demand Board | Current Board |
| | | Baiera |
| Brand | Brand | Brand |
| Britton | Britton | Britton |
| Clarke | Clarke | |
| Esterow | Esterow | Esterow |
| Forbes | Forbes | Forbes |
| Friedman | Friedman | Friedman |
| Gerstner | Gerstner | Gerstner |
| Harford | Harford | Harford |
| Leslie | Leslie | Leslie |
| Studenmund | | |

Plaintiff alleges that at least five of the nine members of the Demand Board—Brand, Clarke, Esterow, Friedman, and Harford—lack independence from Travelport and Blackstone and/or are interested in the New Agreement for the following reasons:

- Brand, who became an Orbitz director in March 2010, is a Managing Director in the Private Equity Group of Blackstone and was formerly a director of Travelport Limited;

4

- Clarke, who became an Orbitz director in June 2007, was formerly Chairman of the board of Travelport Limited from February 2012 to April 2013, Executive Chairman of Travelport Limited from June 2011 to February 2012, and President and CEO of Travelport Limited from May 2006 to May 2011;

- Esterow, who became an Orbitz director in August 2011, was formerly the President and CEO of Travelport Limited's Gullivers Travel Associates business from January 2007 to May 2011, and he was an employee of Travelport and its former parent, Cendant Corporation, for sixteen years;

- Friedman, who became an Orbitz director in March 2011, is a Senior Advisor in the Private Equity Group of Blackstone and was formerly Blackstone's Chief Legal Officer from January 2003 to August 2010; and

- Harford, who became an Orbitz director in 2009, assumed his position as Orbitz's Chief Executive Officer in 2009 when Travelport owned a majority of Orbitz. He has received approximately $12 million in compensation as CEO over the past three fiscal years (2011-2013).[4]

For simplicity, I refer to the Travelport Defendants, Blackstone, and the Orbitz directors named as defendants (who comprise the Demand Board and the Current Board) collectively as "Defendants."

Plaintiff Teamsters Union 25 Health Services & Insurance Plan ("Plaintiff") has been an Orbitz stockholder at all relevant times.

## B. The Formation and Early History of Orbitz

In 2000, several United States airlines established the predecessor to Orbitz, which launched Orbitz.com in June 2001. In December 2003, Orbitz's predecessor completed an initial public offering (IPO), and, in September 2004, it was acquired by Cendant Corporation ("Cendant"). In August 2006, Blackstone and Technology Crossover

---

[4] *Id.* ¶¶ 20, 22-23, 25, 27, 125, 125 n.6.

Ventures acquired Travelport, Cendant's travel distribution services business, which owned the Orbitz.com travel website.

In June 2007, Travelport separated its Orbitz.com and related businesses into the Company, which was incorporated in Delaware as Orbitz Worldwide, Inc. In July 2007, Orbitz completed an IPO, after which Travelport continued to own a majority of the outstanding common stock of the Company.[5] Orbitz's common stock trades on the New York Stock Exchange (NYSE).

When Orbitz went public in 2007, its Amended and Restated Certificate of Incorporation, dated July 18, 2007 (the "Orbitz Charter"), contained several provisions requiring Travelport's consent for the Company to take certain actions. Those actions include effectuating a consolidation or merger transaction, declaring dividends on any class of Orbitz capital stock, amending the amount of authorized capital stock or creating any class or series of capital stock, changing the number of directors on the Orbitz board, establishing any committee of the Orbitz board, determining the members of the Orbitz board or of any committee of the Orbitz board, and filling any newly created directorships or vacancies on the Orbitz board or on any committee of the Orbitz board.[6]

---

[5] *Id.* ¶ 36.

[6] *Id.* ¶ 53; *see also* Lyons Aff. I, Ex. H (Orbitz Charter) at Art. Tenth.

These provisions remain in effect until Travelport ceases to beneficially own shares entitled to vote at least 33 1/3% of the votes entitled to be cast by Orbitz's then-outstanding common stock.[7]

### C. The Old Agreement Between Orbitz and Travelport

In connection with its July 2007 IPO, Orbitz entered into a multi-year services agreement with Travelport (the "Old Agreement") under which Travelport would provide global distribution system services (called "GDS" in the industry) to Orbitz.[8] The Old Agreement was to expire on December 31, 2014.

Under the Old Agreement, Orbitz earned incentive revenue for processing air, car, and hotel reservations (called "segments") through Travelport, and Travelport earned transaction processing revenue from Orbitz. Orbitz was obligated to process a minimum number of segments for its domestic brands through Travelport. Specifically, if the Company did not process at least 95% of its segments through Travelport, then it was required to pay to Travelport a shortfall fee of $1.25 per segment below the required minimum.[9]

---

[7] Lyons Aff. I, Ex. H (Orbitz Charter) at Art. Seventh §§ G(iii), H.

[8] Compl. ¶ 37. According to Plaintiff, Orbitz and Travelport are also parties to "a corporate travel management services agreement, master license agreement, and various letter agreements and financial services agreements." *Id.* ¶ 42. The terms of those other agreements are not implicated in this action.

[9] *Id.* ¶¶ 37-38. The Old Agreement also required Orbitz's website ebookers to use Travelport exclusively to process segments in certain European countries. If the Company did not process at least 95% of those segments through Travelport, then it was required to pay a shortfall fee of $1.25 per segment for each segment processed through an alternative GDS provider. *Id.* ¶ 39.

7

For the year ended December 31, 2013, Orbitz recognized $88.6 million in incentive revenue for segments processed through Travelport, which represented more than 10% of the Company's total net revenue. For the same period, Travelport generated $152 million in transaction processing revenue from Orbitz, which represented approximately 8% of Travelport's transaction processing revenue.

### D. Travelport Completes a Refinancing

In early 2013, Blackstone had majority control of Travelport, and Travelport owned approximately 53% of Orbitz's stock. Under NYSE Rule 303A.00, Orbitz was a "controlled company" because Blackstone held more than 50% of the voting power for the election of Orbitz directors.[10]

In April 2013, Travelport completed a capital refinancing that resulted in Blackstone no longer owning a majority equity interest in Travelport.[11] Around this time, Travelport reduced its interest in Orbitz from 53% to 48%.[12] On April 18, 2013, Orbitz announced that, as of April 15, 2013, it was no longer a "controlled company" as defined

---

[10] *Id.* ¶ 44; *see also* N.Y. Stock Exchange, Listed Company Manual § 303A.00 (2015), http://nyse.com/lcm (hereinafter NYSE Rules).

[11] Compl. ¶¶ 45, 47. The record does not reflect Blackstone's precise ownership stake in Travelport immediately before or after the refinancing.

[12] *Id.* ¶ 51. Counsel for the Orbitz Defendants stated at oral argument that Travelport's ownership interest at the time of the New Agreement was closer to 44.8%. Tr. of Oral Arg. 7. Plaintiff acknowledged that its allegations were likely based on "slightly stale numbers" from Travelport's S-1 SEC filing and that, according to Orbitz's 10-K that was filed "two or three weeks" before this action was filed, "Travelport's holdings were approximately 45 percent." *Id.* 92.

in NYSE Rule 303A.00 because no company or group of companies held more than 50% of the voting power for the election of Orbitz directors.[13]

After the refinancing, Blackstone remained a "significant stockholder" of Travelport. According to Plaintiff, Blackstone's "significant" ownership interest in Travelport, coupled with Travelport's own 48% ownership interest in Orbitz, meant that "Travelport and Blackstone's interests in Orbitz [were] squarely aligned."[14]

On December 5, 2013, Travelport filed a Shelf Registration Statement with the Securities and Exchange Commission (SEC) under which Travelport would be able to sell all of its Orbitz stock. Plaintiff alleges that this SEC filing "signal[ed] Travelport's intention to further reduce its equity stake in the Company."[15]

### E. Orbitz and Travelport Negotiate the New Agreement

Before Travelport sold any additional Orbitz stock, it allegedly sought to extend the Old Agreement on "favorable" terms.[16] Early renewal of the Old Agreement was important to Travelport because, by early 2014, it allegedly had begun planning its own IPO to occur later in 2014. According to Plaintiff, "[s]ecuring a long-term and lucrative

---

[13] Compl. ¶ 45.

[14] *Id.* ¶¶ 47-48.

[15] *Id.* ¶ 58.

[16] *Id.* ¶ 59.

9

contract with Orbitz in advance of the IPO would help increase Travelport's valuation and the proceeds generated in the offering."[17]

In early 2014, Orbitz and Travelport negotiated the Subscriber Services Agreement (as defined above, the "New Agreement"). The New Agreement was subject to review and approval by Orbitz's Audit Committee because, under its charter, the Audit Committee is responsible for "reviewing and approving" any "Related Party Transactions" between the Company and a "Related Party."[18] The New Agreement qualified as such because it was an agreement involving more than $120,000 per year in which Orbitz was a participant and in which Travelport, which was a Related Party, had a material interest.[19]

On January 29, 2014, Orbitz's Audit Committee (directors Britton, Leslie, and Studenmund) approved the New Agreement.[20] On February 3, 2014, Studenmund notified Orbitz of her intent to resign as a director, effective February 7, 2014.[21]

---

[17] *Id.*

[18] *Id.* ¶¶ 71-74. The Audit Committee charter defines "Related Party Transactions" to include those transactions "(i) in which the Company . . . is a participant, (ii) in which the amount involved will (or may reasonably be expected to) exceed $120,000 in any calendar year and (iii) in which a Related Party has or will have a direct or indirect material interest." *Id.* ¶ 72. The definition of a "Related Party" includes a person or entity known to be "the beneficial owner of 5% or more of the outstanding equity securities of Company." *Id.* ¶ 73; *see also* Lyons Aff. II Ex. B (Charter of the Audit Committee of the Board of Directors of Orbitz Worldwide, Inc., at § 4(t) (Revised Feb. 20, 2013)).

[19] Compl. ¶ 74.

[20] *Id.* ¶ 75.

[21] *Id.* ¶¶ 76-77.

**F.     The Terms of the New Agreement**

On February 4, 2014, Orbitz and Travelport entered into the New Agreement, which terminated and replaced the Old Agreement. Under the New Agreement, which expires on December 31, 2018, Orbitz was obligated for the remainder of 2014 to use Travelport exclusively "for all air and car segments booked on its domestic agencies" as well as for certain "segments booked in Europe and other markets."[22]

Starting January 1, 2015, Orbitz would no longer be subject to an exclusivity obligation, meaning that it could contract with Travelport's competitors (such as Amadeus and Sabre, Inc.) for a portion of the Company's bookings, but Orbitz would be required to provide minimum volume levels to Travelport (the "Minimum Volume Guarantee"). In certain cases, if Orbitz fails to meet the Minimum Volume Guarantee, it must pay a shortfall fee to Travelport.[23] The financial terms of the New Agreement are not publicly available and were not alleged in the Complaint.

**G.     Orbitz's Public Disclosures About Studenmund's Resignation and the New Agreement**

On February 7, 2014, Orbitz filed a Form 8-K with the SEC disclosing Studenmund's resignation. The full text of that Form 8-K is as follows:

---

[22] *Id.* ¶ 60.

[23] *Id.* ¶¶ 60-61.

On February 3, 2014, Jaynie Studenmund notified us of her intent to resign as a member of the Orbitz Worldwide, Inc. Board of Directors effective February 7, 2014.[24]

Plaintiff alleges that the "[n]oticeably absent" lack of explanation for Studenmund's resignation is a departure from precedent because Orbitz "has historically provided stockholders an explanation for director departures."[25] When the Complaint was filed on November 18, 2014, the Orbitz board had not filled the vacancy created by Studenmund's resignation.

On February 10, 2014, Orbitz filed a Form 8-K with the SEC announcing the New Agreement, but that Form 8-K did not disclose that the Audit Committee had approved the New Agreement.[26] On March 6, 2014, Orbitz filed a Form 10-K with the SEC that referenced the Audit Committee's approval of the New Agreement.[27] On May 5, 2014, after Plaintiff initiated this action, Orbitz filed with the SEC a Form 10-Q for the quarter ended March 31, 2014, which specifically disclosed that the Audit Committee had approved the New Agreement on January 29, 2014, pursuant to a delegation by the

---

[24] Lyons Aff. I Ex. C (Orbitz Worldwide, Inc., Current Report (Form 8-K), at Item 5.02 (Feb. 7, 2014)).

[25] Compl. ¶ 78.

[26] *Id.* ¶¶ 60, 75.

[27] Lyons Aff. I Ex. B (Orbitz Worldwide, Inc., Annual Report (Form 10-K), at 15 (Mar. 6, 2014)) ("[O]ur Audit Committee . . . takes an active role in reviewing and approving any agreement involving more than $120,000 of payments or receipts in which Travelport (or any other related party) has an interest, including the New Travelport GDS Service Agreement entered into on February 4, 2014.").

Company's board of directors.[28]   Orbitz attached a redacted version of the New Agreement as an exhibit to that Form 10-Q.

## H.    Changes in the Composition of Orbitz's Board of Directors

On April 10, 2014, the Orbitz board appointed Forbes to the Audit Committee to fill the committee vacancy created by Studenmund's resignation.   Thereafter, directors Britton, Forbes, and Leslie were the three members of the Audit Committee.[29]

Also on April 10, Clarke notified the Company of his resignation as an Orbitz director, effective immediately, due to his appointment as the CEO of Eastman Kodak Co.   The Orbitz board appointed Baiera to fill the vacancy created by Clarke's resignation.[30]   Baiera is a Travelport director and a Managing Director at Angelo, Gordon & Co., L.P., a privately-held investment advisor that held an approximately 17% stake in Travelport at the time of Baiera's appointment.[31]

---

[28] Compl. ¶ 75; *see also* Lyons Aff. I Ex. G (Orbitz Worldwide, Inc., Quarterly Report (Form 10-Q), at 19-20 (May 5, 2014)) ("On January 29, 2014, the Audit Committee of the Board of Directors had approved the New Travelport Service Agreement and authorized the execution of such agreement, pursuant to a delegation by the Company's Board of Directors on August 13, 2013.").

[29] Compl. ¶ 83; Lyons Aff. I Ex. F (Orbitz Worldwide, Inc., Proxy Statement (Form 14A), at 9 (Apr. 25, 2014)).

[30] Compl. ¶ 85; Orbitz Worldwide, Inc., Current Report (Form 8-K), at Ex. 99.1 (Apr. 14, 2014) (explaining that Clarke "resigned from the board after seven years as chairman following his recent appointment as chief executive officer of Eastman Kodak Company").

[31] Compl. ¶ 19.

On April 14, 2014, the Company filed a Form 8-K with the SEC disclosing these developments.[32] Plaintiff contrasts the public explanation of Clarke's resignation and quick appointment of Baiera to the resulting vacancy with Studenmund's unexplained resignation and the ongoing vacancy created by her resignation.[33]

## I. Travelport Liquidates Substantially All of its Orbitz Stock and Completes its Own IPO

On May 23, 2014, the Company filed a prospectus supplement with the SEC to facilitate an underwritten offering of 7.5 million shares of Orbitz stock held by Travelport. The underwriters also had a 30-day option to buy an additional 1.125 million shares of Orbitz stock from Travelport. After consummating the offering, Travelport owned approximately 37% of Orbitz's stock.[34] Around the time of the offering, a Travelport spokesperson stated that "[Travelport's] Orbitz equity stake is no longer a strategic investment for [Travelport]."[35]

On June 4, 2014, Travelport filed an IPO prospectus to offer up to $100 million in stock. In its prospectus, Travelport noted that it had "addressed legacy contracts" by, among other actions, "entering into a new long-term contract [*i.e.*, the New Agreement]

---

[32] *Id.* ¶ 85. According to Orbitz's 2014 proxy statement, which was filed with the SEC on April 25, 2014, Travelport had previously recommended Clarke to be an Orbitz director, and "Travelport recommended Gavin Baiera to fill the vacancy created by [Clarke's] resignation." *Id.*

[33] *Id.* ¶¶ 86-87.

[34] *Id.* ¶¶ 88, 90.

[35] *Id.* ¶ 89.

14

in February 2014 with Orbitz Worldwide."[36]  Travelport disclosed that Orbitz "currently is the largest travel agency on [its] Travel Commerce Platform, accounting for 7% of [its] net revenue in the year ended December 31, 2013."[37]  Travelport further disclosed that "[i]n the event Orbitz Worldwide . . . terminates its relationship with [Travelport], . . . [Travelport's] business and results of operations would be adversely affected."[38]

On July 16, 2014, the Company announced an underwritten public offering by Travelport of 20 million shares of Orbitz stock, with a 30-day option for the underwriters to buy an additional 3 million shares.  At the time, Travelport beneficially owned 39,782,697 shares of Orbitz stock, or approximately 36.1% of the Company.  On July 17, 2014, the Company announced that the size of the offering would be increased to 34 million shares, with the 30-day option for the underwriters increasing to an additional 5 million shares.[39]  On July 22, 2014, Travelport completed an underwritten offering of 39 million shares of Orbitz stock.  After the offering, Travelport owned 782,697 shares of Orbitz, or less than 1% of the Company.[40]

---

[36] *Id.* ¶ 91.

[37] *Id.* ¶ 92.

[38] *Id.*

[39] *Id.* ¶¶ 95-97.

[40] *Id.* ¶¶ 98-99.

## J.      Orbitz's Compliance with the NYSE Rules

Plaintiff alleges that the Orbitz board has failed to comply with the NYSE Rules and the Company's Corporate Governance Guidelines (the "Guidelines").[41]  Under both the NYSE Rules and the Guidelines, the Orbitz board was required to have a majority of "independent" directors by April 14, 2014, which was one year after Orbitz was no longer a "controlled company" under NYSE Rule 303A.00.[42]  NYSE Rule 303A.02 sets forth certain standards to be deemed an "independent" director.

In its proxy statement for its 2013 annual meeting, filed with the SEC on April 26, 2013, Orbitz disclosed that its board had determined that four directors (Britton, Gerstner, Leslie, and Studenmund) were independent under the NYSE Rules and that six directors (Brand, Esterow, Forbes, Friedman, Jill Greenthal,[43] and Harford) were not independent.[44]  In its 2014 proxy statement, filed on April 25, 2014, Orbitz disclosed that its board had determined that seven directors (Brand, Britton, Esterow, Forbes, Friedman, Gerstner, and Leslie) were independent under the NYSE Rules and that two directors (Baiera and Harford) were not independent.[45]  Thus, by April 2014, the Orbitz board had

---

[41] *Id.* ¶¶ 101-16.

[42] *Id.* ¶¶ 105-06.

[43] Greenthal, a Senior Advisor in the Private Equity Group of Blackstone, resigned from the Orbitz board in May 2013.  *Id.* ¶ 49.

[44] *Id.* ¶ 107.

[45] *Id.* ¶ 110.

16

determined that a majority of its members were "independent" as required by NYSE Rule 303A.01.

### K. Procedural History

On April 3, 2014, Plaintiff filed its initial complaint. On November 18, 2014, Plaintiff filed the Verified Second Amended Stockholder Class Action and Derivative Complaint (as defined above, the "Complaint"), asserting five causes of action.

On December 4, 2014, the Orbitz Defendants moved to dismiss the Complaint under Court of Chancery Rule 23.1 for failure to make a pre-suit demand or to plead facts excusing such a demand, and under Court of Chancery Rule 12(b)(6) for failure to state a claim. Also on December 4, Travelport and Blackstone moved to dismiss the Complaint under Court of Chancery Rules 23.1 and 12(b)(6). On April 15, 2015, I heard oral argument on these motions.

## III. LEGAL ANALYSIS

### A. Demand is Not Excused as to Counts I-IV

#### 1. Counts I-IV are Derivative

In Count I of the Complaint, Plaintiff alleges that Travelport breached its fiduciary duties as Orbitz's controlling stockholder by causing "the Company to enter the unfair [New Agreement] to suit Travelport's unique needs to the detriment of the Company."[46] In Count II, Plaintiff alleges that the Agreement Board (excluding Studenmund) breached their fiduciary duties by participating "in the planning and execution of the unfair and

---

[46] Compl. ¶ 129.

17

improper [New Agreement]" and by failing "to take the necessary actions to extract fair terms in this related-party transaction."[47]  In Count III, Plaintiff alleges that Travelport was unjustly enriched by the New Agreement.[48]  In Count IV, Plaintiff alleges that Travelport and Blackstone aided and abetted the board's breaches of fiduciary duty by "knowingly solicit[ing], encourag[ing] and/or participat[ing] in the unlawful [New Agreement]."[49]

Plaintiff asserts Counts I-IV derivatively.  Defendants agree that these claims are derivative.  I agree as well because Counts I-IV all center on whether or not the New Agreement is fair to the Company.  Thus, under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,[50] Counts I-IV are straightforward examples of derivative claims because Orbitz suffered the alleged harm as a party to the New Agreement, and Orbitz would receive the benefit of any recovery from Defendants.

### 2. Demand Futility is Governed by *Rales v. Blasband*

"Because the shareholders' ability to institute an action on behalf of the corporation inherently impinges upon the directors' power to manage the affairs of the

---

[47] *Id.* ¶ 135.  Count II also alleges that the members of the Agreement Board (excluding Studenmund) breached their fiduciary duties by failing "to reconstitute the Board to consist of a majority of independent directors as required under the NYSE Rules and the . . . Guidelines."  *Id.* ¶ 135.  I address this allegation in the context of the identical allegations made against the Current Board under Count V.

[48] *Id.* ¶¶ 142-43.

[49] *Id.* ¶ 146.

[50] 845 A.2d 1031 (Del. 2004).

18

corporation the law imposes certain prerequisites on a stockholder's right to sue derivatively."[51]  Under Court of Chancery Rule 23.1, because Plaintiff did not make a demand on the Company's board before initiating this action,[52] it must allege with particularity that its failure to make such a demand should be excused.  In this analysis, I accept as true Plaintiff's particularized allegations of fact and draw all reasonable inferences that logically flow from those allegations in Plaintiff's favor.[53]

Under Delaware law, there are two tests for demand futility:  (i) the test articulated in *Aronson v. Lewis*,[54] which applies when a plaintiff challenges "a decision of the board upon which plaintiff must seek demand";[55] and (ii) the test set forth in *Rales v. Blasband*,[56] which applies when a plaintiff does not challenge "a decision of the board in place at the time the complaint is filed."[57]  A decision approved by at least half of the corporation's directors who would consider a demand, even when acting by committee, can be imputed to the entire board and thus triggers the *Aronson* test "for purposes of

---

[51] *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988).

[52] Compl. ¶ 120.

[53] *See White v. Panic*, 783 A.2d 543, 549 (Del. 2001).

[54] 473 A.2d 805 (Del. 1984).

[55] *Ryan v. Gifford*, 918 A.2d 341, 353 (Del. Ch. 2007).

[56] 634 A.2d 927 (Del. 1993).

[57] *Ryan*, 918 A.2d at 352.

proving demand futility."[58] By contrast, the *Rales* test applies where a derivative plaintiff challenges a decision approved by a board committee consisting of less than half of the directors who would have considered a demand, had one been made.[59] To establish demand futility under *Aronson* or *Rales* for Counts I-IV, Plaintiff must impugn the ability of at least half of the directors in office when it initiated this action (*i.e.*, the Demand Board) to have considered a demand impartially.[60]

Citing to the Company's public filings, the Complaint alleges that the Audit Committee, consisting of three members, approved the New Agreement.[61] In fact, the Complaint alleges that such approval not only occurred, but was required under the Audit Committee's charter because the New Agreement was a "Related Party Transaction."[62] As the Audit Committee's charter states: "The audit committee will . . . be responsible

---

[58] *Id.* at 353 (applying *Aronson* because the challenged decisions were approved unanimously by a three-member committee of a six-member board).

[59] *See Calma v. Templeton*, 114 A.3d 563, 575 (Del. Ch. 2015) ("[B]ecause the decisions to grant the [non-employee director compensation awards] were made by less than half of the Citrix directors in office when Plaintiff filed the Complaint, the *Rales* test applies."); *see also Conrad v. Blank*, 940 A.2d 28, 37 (Del. Ch. 2007) ("Since the challenged transaction was not made by the board, or even half of its members, the test articulated in *Rales* is the proper standard.").

[60] *See Beneville v. York*, 769 A.2d 80, 82 (Del. Ch. 2000).

[61] Compl. ¶ 9 (citing the Company's proxy statement dated April 25, 2014); *id.* ¶ 75 (citing the Company's Form 10-Q dated May 5, 2014); *see also id.* ¶¶ 70, 74, 81.

[62] *Id.* ¶ 74 ("Thus, the Company could not enter into [the New Agreement] without the review and approval of the Audit Committee."); *see also id.* ¶ 8.

for the review, approval or ratification of Related Party Transactions."[63] Despite these well-pled allegations, Plaintiff argues that *Aronson* should apply because there is "a reasonable inference that the full Board would have been involved in the [New Agreement's] approval" (1) "[g]iven the significance of the [New Agreement] to Orbitz—including that it constitutes 10% of Orbitz's annual revenue and is central to Orbitz's online travel-booking business" and (2) given that the Audit Committee charter, which required committee review and approval of the New Agreement, does not use the word "negotiate."[64] I disagree.

The inference of full board approval Plaintiff asks me to draw amounts to little more than speculation. This is contrary to a well-recognized purpose of the demand futility requirement of Rule 23.1, which is to "not permit a stockholder to cause the corporation to expend money and resources in discovery and trial in the stockholder's quixotic pursuit of a purported corporate claim based solely on conclusions, opinions or speculation."[65] Given that the Company's organic documents placed the responsibility for review and approval of the New Agreement, as a Related Party Transaction, in the

---

[63] Lyons Aff. II Ex. B (Charter of the Audit Committee at § 4(t)). Consistent with this policy, Orbitz disclosed in its 2014 proxy statement that the Orbitz board "delegated to the Audit Committee the responsibility, power and authority to, on behalf of the Board, consider, evaluate and approve all agreements for the provision of global distribution systems services, including the agreement entered into with Travelport in February 2014." Lyons Aff. I Ex. F (Orbitz Worldwide, Inc., Proxy Statement (Form 14A), at 9 (Apr. 25, 2014)).

[64] Pl.'s Ans. Br. 9, 16-17.

[65] *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

21

hands of the Audit Committee, and the absence of any well-pled facts suggesting that the Company deviated from this policy, I decline to draw the inference that the full board approved the New Agreement. I also view Plaintiff's construction of the Audit Committee's charter to be hyper-technical and unreasonable.[66] It is an unsupported leap of logic to infer from the lack of the word "negotiate" in that charter that the full board approved the New Agreement.

Drawing an inference of full board approval would be particularly inappropriate here given Plaintiff's decision not to use 8 *Del. C.* § 220 to obtain documents relating to the review and approval of the New Agreement,[67] despite repeated admonitions Delaware courts have made for representative plaintiffs to do so before launching derivative claims. Documents from such an inspection undoubtedly would have confirmed whether any factual basis exists for the assertion of full board approval that Plaintiff asks the Court to infer. There is no equity in asking the Court to speculate over a factual matter that was well within Plaintiff's control to determine through basic due diligence.

In sum, from my reading of the Complaint, the reasonable inference to be drawn from its well-pled allegations is that only the Audit Committee approved the New

---

[66] *See In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 764 (Del. Ch. 2005) (rejecting the argument that a compensation committee lacked the authority to negotiate the President's salary where its charter expressly provided that it was responsible for establishing and approving the President's salary, because "there is no language in the charter that would indicate that the committee does not have this power" to negotiate), *aff'd*, 906 A.2d 27 (Del. 2006).

[67] Tr. of Oral Arg. 103 ("We made a determination not to make a 220 demand.").

Agreement.[68]  Because the Audit Committee consisted of just three members when it approved the New Agreement, only two of whom remained on the Orbitz board when Plaintiff initiated this action, the *Rales* test applies because more than half of the nine members of the Demand Board did not approve the New Agreement.

### 3.  Demand is Not Excused for Counts I-IV under *Rales*

Under *Rales*, Plaintiff's claims should be dismissed under Rule 23.1 unless the particularized allegations of the Complaint "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[69]  When Plaintiff initiated this action, the Demand Board had nine members.  Thus, under *Rales*, the Complaint "must plead facts specific to each director, demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand."[70]  Plaintiff advances three arguments for why its failure to make a demand should be excused as futile.[71]  I address each argument in turn.

---

[68] In contrast to its factually supported allegations of Audit Committee approval of the New Agreement, the Complaint alleges in other places in conclusory fashion that the "New GDS Agreement Director Defendants"—defined as the nine individuals on the Demand Board (Compl. ¶ 29)—approved the New Agreement.  *See id.* ¶¶ 122, 135, 145, 147.  Presumably recognizing the lack of factual support for this allegation, Plaintiff did not rely on it to argue for the application of the *Aronson* test.

[69] *Rales*, 634 A.2d at 934.

[70] *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007).

[71] Plaintiff frames its demand futility arguments collectively as to all of Counts I-IV even though, under Delaware law, the demand futility analysis "is conducted on a claim-by-

23

### a. Plaintiff Has Not Raised a Reasonable Doubt as to the Impartiality of a Majority of the Demand Board

Plaintiff first argues that a majority of the nine members of the Demand Board either were interested in the New Agreement or were not independent from Travelport and/or Blackstone, such that there is a reasonable doubt that a majority of the Demand Board could have properly exercised their business judgment in responding to a demand.[72] Because Plaintiff concedes that four members of the Demand Board (Britton, Forbes, Gerstner, and Leslie) were independent and did not have a financial interest in the New Agreement,[73] it must raise a reasonable doubt that each of the five other directors on the Demand Board (Brand, Clarke, Esterow, Friedman, and Harford) could have impartially considered a demand for all of Counts I-IV. To resolve that issue, I need only consider the allegations concerning one of these five directors. I focus on Esterow.

Plaintiff does not argue that Esterow had any financial interest in the New Agreement but rather contends that he is not independent from Travelport because of his "long-term and high-level employment with Travelport."[74] As alleged, Esterow was an executive of Travelport or Cendant (Travelport's former parent) for sixteen years, ending

claim basis." *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014).

[72] Pl.'s Ans. Br. 18.

[73] One could interpret Plaintiff's second demand futility argument (*i.e.*, that the directors who approved the New Agreement did so in bad faith so as to expose them to a substantial likelihood of personal liability) as a challenge to the disinterestedness of Britton and Leslie, but this argument is without merit for the reasons discussed below.

[74] *Id.* 28-30.

24

in May 2011. For the last four of those years, from January 2007 to May 2011, Esterow was President and CEO of Travelport Limited's Gullivers Travel Associates business. In August 2011, three months after Esterow left his position at Travelport, he was appointed to the Orbitz board.[75] In my opinion, these allegations do not raise a reasonable doubt as to Esterow's independence in considering a demand for any of Counts I-IV.

In the demand futility context, directors are "presumed to be independent."[76] Under Delaware law, "[i]ndependence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[77] "[A] lack of independence can be shown by pleading facts that support a reasonable inference that the director is beholden to a controlling person or 'so under their influence that their discretion would be sterilized.' "[78] Thus, a non-interested director is not independent if particularized allegations support the inference that he or she "would be more willing to risk his or her reputation than risk the relationship with the interested [person]." [79]

---

[75] Compl. ¶¶ 23, 125.

[76] *Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004).

[77] *Aronson*, 473 A.2d at 816.

[78] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *Rales*, 634 A.2d at 936).

[79] *Beam*, 845 A.2d at 1052.

With these general principles in mind, the case of *In re Western National Corp. Shareholders Litigation*[80] provides a useful lens with which to evaluate Plaintiff's challenge to Esterow's presumed independence. In *Western National*, the plaintiffs asserted that the chairman and CEO (Poulos) of Western National was not independent of its 46% stockholder (American General) when Poulos and the other members of the Western National board approved a merger with American General. In opposing the defendants' motion for summary judgment, the plaintiffs put forward evidence showing that, before Poulos was hired at Western National, he had been an employee of American General for over two decades, including as a senior officer. Chancellor Chandler rejected the plaintiffs' argument that this past employment was a sufficient basis to overcome the presumption that Poulos was an independent director:

> Plaintiffs . . . argue that Poulos's former employment by American General coupled with his personal friendships with American General executives caused him to improperly favor that company in the merger. It may indeed be true that Poulos enjoys fond recollections of his twenty-three year career at American General (prior to joining Western National) and it is undoubtedly true that he maintained close social and professional ties with his colleagues there. Nevertheless, such facts do not warrant the inference that Poulos favored the fortunes of American General over those of a company in which he holds substantial equity and has served as executive chairman for its entire existence as a publicly-held entity.[81]

---

[80] 2000 WL 710192 (Del. Ch. May 22, 2000).

[81] *Id.* at *12. The Court ultimately concluded, based on a peculiar provision in a shareholders' agreement between Western National and American General, that there was an issue of material fact as to whether "Poulos was entirely independent of American General." *Id.* at *14.

26

Plaintiff's allegations about Esterow's supposed lack of independence from Travelport are similar in my view to those the Court rejected in *Western National*. As with Poulos in *Western National*, it is unreasonable in my view to question Esterow's presumptive independence based solely on an employment relationship that ended in May 2011, almost three years before this action was filed in April 2014. Even if I infer from the three-month window between Esterow's departure from Travelport and his appointment to the Orbitz board that his directorship was a "loyalty appointment" by Travelport,[82] the mere fact that Travelport, an alleged controlling stockholder, "played some role in the nomination process should not, without additional evidence, automatically foreclose a director's potential independence."[83] Thus, the inference that Esterow "was nominated by or elected at the behest of" Travelport, which had the ability to "control[] the outcome of a corporate election" by virtue of its majority interest when Esterow joined the Orbitz board, does not overcome his presumed independence.[84]

The only additional fact Plaintiff has alleged to challenge Esterow's independence is that, at the time of the Company's April 2013 proxy statement, which was filed

---

[82] Pl.'s Ans. Br. 28.

[83] *W. Nat'l*, 2000 WL 710192, at *15 (citing *Aronson*, 473 A.2d at 815); *see also Beam*, 845 A.2d at 1051 ("Allegations that [the controller] and the other directors . . . developed business relationships before joining the board . . . are insufficient, without more, to rebut the presumption of independence."); *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."), *appeal docketed* No. 629,2014 (Del. Nov. 13, 2014).

[84] *See Aronson*, 473 A.2d at 816.

approximately two years after Esterow had left Travelport, Orbitz did not consider him to be an "independent" director under the NYSE Rules.[85] As then-Chancellor Strine observed in *In re MFW Shareholders Litigation*,[86] the NYSE Rules may be "a useful source for this court to consider when assessing an argument that a director lacks independence" because they "were influenced by experience in Delaware and other states and were the subject of intensive study by expert parties."[87] That said, a board's determination of director independence under the NYSE Rules is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility purposes.

For example, NYSE Rule 303A.02(b)(i) establishes a bright-line rule of disqualification for independence if a director has been an employee of the "listed company" within the last three years. The NYSE Rules define "listed company" to include a parent entity that owns over 50% of the company.[88] Thus, because Travelport

---

[85] Compl. ¶ 107.

[86] 67 A.3d 496 (Del. Ch. 2013), *aff'd sub nom.*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[87] *Id.* at 510. In *MFW*, the plaintiffs challenged that three directors, all of whom had been deemed "independent" under the NYSE Rules, were not independent of the company's controlling stockholder when they approved a merger between the two. In concluding on the defendants' summary judgment motion that those directors were independent, then-Chancellor Strine relied, in part, on the fact that the plaintiffs' evidence of conflicts did not rise to the level to disqualify those directors' independence under the NYSE Rules. *See id.* at 512-13.

[88] More precisely, the references to "listed company" in the bright-line disqualification provisions of NYSE Rule 303A.02 include any parent or subsidiary in a consolidated group with the listed company. The NYSE defines "consolidated group" to mean "a

held over 50% of the stock of Orbitz before April 2013, it fell within the definition of "listed company" as of that date, meaning that Esterow could not be deemed independent under the NYSE Rules until the earlier of (i) three years from May 2011, when he left Travelport, or (ii) when Travelport ceased to own a majority of Orbitz's stock. Notably, after Travelport had reduced its position in Orbitz below 50%, the Company disclosed in its April 2014 proxy statement that the Orbitz board had determined that Esterow was independent within the meaning of the NYSE Rules.[89]

Unlike the NYSE Rules, Delaware law does not contain bright-line tests for determining independence but instead engages in a case-by-case fact specific inquiry based on well-pled factual allegations.[90] The relevant inquiry here is whether, based on the factual allegations of the Complaint, Esterow should be deemed independent when this action was filed in April 2014—almost three years after he had severed his ties with Travelport, and after he had been named President, CEO, and a director of Bankrate, Inc.,

company, its parent or parents, and/or its subsidiaries that would be required under U.S. generally accepted accounting principles to prepare financial statements on a consolidated basis." *See Section 303A Corporate Governance Standards, Frequently Asked Questions*, NYSE Regulation, 7 (Jan. 4, 2010), https://www.nyse.com/publicdocs/ nyse/regulation/nyse/final_faq_nyse_listed_company_manual_section_303a_updated_1_ 4_10.pdf.

[89] Compl. ¶ 110 ("The Board has determined that Mark [Britton], Brad [Gerstner], Kris [Leslie], Martin [Brand], Ken [Esterow], Bob [Friedman] and Scott [Forbes] are independent within the meaning of NYSE corporate governance rules and have no other material relationships with us that could interfere with their ability to exercise independent judgment.").

[90] *See Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) ("[Delaware courts] reach conclusions as to the sufficiency of allegations regarding interest and independence only after considering all the facts alleged on a case-by-case basis.").

a company unaffiliated with Travelport.[91]  Given the peculiarities of the NYSE Rules, the fact that Esterow was not designated as "independent" under the NYSE Rules in Orbitz's April 2013 proxy statement carries little weight.  Rather, for the reasons explained above, the factual allegations concerning Esterow's former relationship with Travelport are insufficient in my view to cast reasonable doubt on his presumed independence under Delaware law.

Because Plaintiff has not raised a reasonable doubt as to Esterow's independence from Travelport, I conclude that demand is not excused as to any of Counts I-IV because a majority of the Demand Board (Britton, Esterow, Forbes, Gerstner, and Leslie) could have impartially exercised their business judgment in responding to such a demand. Based on this conclusion, I need not consider Plaintiff's challenges to the disinterestedness or independence of the remaining four members of the Demand Board (Brand, Clark, Forbes and Friedman).

### b.      Plaintiff Has Not Raised a Reasonable Doubt that the New Agreement was Approved in Bad Faith

Plaintiff's second demand futility argument is that the New Agreement was not a valid exercise of business judgment.  Although Plaintiff did not frame it as such, the crux of the argument is that the Orbitz directors who approved the New Agreement did so in bad faith such that they cannot impartially consider a demand as to Counts I-IV.[92]  Put in

---

[91] Lyons Aff. I Ex. J (Orbitz Worldwide, Inc., Proxy Statement (Form 14A), at 6 (Apr. 25, 2014)).

[92] Pl.'s Ans. Br. 44.

30

demand futility terms, Plaintiff contends that Britton and Leslie (as the only members of the Demand Board who approved the New Agreement) are not disinterested because they face a substantial likelihood of personal liability for not approving the New Agreement in good faith.[93] In my view, Plaintiff has not made such a showing.

"[I]f the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under *Rales*, excusing demand."[94] "A simple allegation of potential directorial liability is insufficient to excuse demand, else the demand requirement itself would be rendered toothless, and directorial control over corporate litigation would be lost."[95] Where, as here, the corporation's charter includes an exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7),[96] a substantial likelihood of liability "may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts."[97] The theory here is a lack of good faith.

---

[93] Even if Plaintiff adequately pled a lack of good faith by Britton and Leslie, *Rales* would still require Plaintiff to raise a reasonable doubt as to a majority of the Demand Board. I need not perform this analysis because Plaintiff has failed to plead a lack of good faith by either Britton or Leslie for the reasons explained above.

[94] *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003).

[95] *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011).

[96] Lyons Aff. I, Ex. H (Orbitz Charter) at Art. Sixth ("No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the [DGCL] as the same exists or may hereafter be amended.").

[97] *See Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (citation omitted).

Because "the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally,"[98] a plaintiff can show a lack of good faith by establishing that a director "failed to pursue the best interests of the corporation and its stockholders."[99]  Additionally, as Chancellor Allen recognized in *In re J.P. Stevens & Co., Inc. Shareholders Litigation*,[100] a plaintiff may show a lack of good faith by establishing that a director's decision was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[101]  This is a high pleading standard, as Delaware courts typically frame a lack of good faith in terms of "intentional" misconduct.[102]

The New Agreement was approved by the three members of the Audit Committee: Britton, Leslie, and Studenmund.  The Complaint does not allege that any of these

---

[98] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[99] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).

[100] 542 A.2d 770 (Del. Ch. 1988).

[101] *Id.* at 780-81; *see also Parnes v. Balley Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999) (citing *J.P. Stevens*, 542 A.2d at 780-81).  Elsewhere, Chancellor Allen described this demand futility theory as akin to the test for waste. *See Kahn v. Tremont Corp.*, 1994 WL 162613, at *6 (Del. Ch. Apr. 21, 1994) ("The second prong of *Aronson* is, I suppose, directed to extreme cases in which despite the appearance of independence and disinterest a decision is so extreme or curious as to itself raise a legitimate ground to justify further inquiry and judicial review.  The test for [establishing demand futility on this ground] is thus necessarily high, similar to the legal test for waste.").

[102] *See, e.g.*, *Walt Disney*, 906 A.2d at 67 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation[.]").

individuals had a personal financial interest in the New Agreement or were not independent.[103] Rather, Plaintiff contends they acted in bad faith because the "material terms" of the New Agreement "deviate from market standards and are patently unfair to Orbitz yet highly beneficial to Travelport."[104] The provisions of the New Agreement that Plaintiff challenges as "patently unfair" include "(a) continued exclusivity; (b) the Minimum Volume [Guarantee]; (c) shortfall penalties; and (d) a five-year term."[105]

In response, Defendants submit that the terms of the New Agreement "represent a value-for-value contract."[106] They argue, under the reasoning of *In re Sanchez Energy Derivative Litigation*,[107] that "Plaintiff's failure to allege or point to any specific financial information (negative or otherwise) concerning the [New Agreement], especially in light of its positive economic aspects, . . . requires dismissal of the Complaint."[108] I agree.

In *Sanchez Energy*, plaintiffs argued that demand was excused because an agreement between a company and its alleged controlling stockholder was "so facially unfair that it could not possibly have been the product of a valid business judgment."[109]

---

[103] *See* Compl. ¶¶ 120-126.

[104] Pl.'s Ans. Br. 46.

[105] *Id.* 44-45.

[106] Orbitz Defs.' Reply Br. 32.

[107] 2014 WL 6673895 (Del. Ch. Nov. 25, 2014), *appeal docketed* No. 702,2014 (Del. Dec. 19, 2014).

[108] Orbitz Defs.' Reply Br. 34.

[109] *Sanchez Energy*, 2014 WL 6673895, at *10.

33

Specifically, they alleged that the price of the transaction at issue (the sale of a one-half interest in 80,000 acres of potential oil reserves at roughly $2,500 per acre) was grossly unfair because it was approximately 17 times higher than the price paid in an ostensibly comparable, arms-length transaction (the sale of a working interest in 172,000 acres of potential oil reserves reportedly at $144 per acre). The Court rejected this argument, concluding that the derivative complaint did not support an inference of bad faith on behalf of the directors because it was devoid of "information about the nature, quality and duration of the . . . working interests [in the 172,000 acres] to allow a meaningful comparison to those acquired by [the company]."[110] In other words, the Court was unable to conclude that the challenged transaction was so unfair as to support an inference of bad faith because the plaintiffs failed to allege material terms of the supposedly comparable transaction.

Here, as in *Sanchez Energy*, Plaintiff has failed to allege with particularity facts from which I could reasonably infer that the New Agreement was so facially unfair as to constitute a lack of good faith by Britton and Leslie, the members of the Audit Committee who were part of the Demand Board. While in *Sanchez Energy* the problem was the lack of information about the allegedly comparable transaction, here the pleading deficiency is more basic: Plaintiff has not alleged *any* of the financial terms of the New

---

[110] *Id.* at *12. For similar reasons, the Court also rejected the plaintiffs' comparisons to another transaction.

Agreement.[111] Instead, Plaintiff asks that I look at the publicly available terms—such as the Minimum Volume Guarantee and the five-year duration—without regard for the financial terms that formed the basis of Orbitz's and Travelport's mutual exchange of consideration. It would be imprudent for me to do so because there is no well-pled baseline from which I can make a "meaningful comparison" between the New Agreement and other GDS services contracts in the travel industry, the financial terms of which Plaintiff also failed to allege in the Complaint.[112] Thus, I have no informational basis from which I could conclude that the New Agreement was "so far beyond the bounds of reasonable judgment" as to constitute bad faith or to demonstrate that the members of the Audit Committee put the interests of Travelport and/or Blackstone ahead of the best interests of the Company.[113] Accordingly, Plaintiff failed to establish that demand should be excused as to any of Counts I-IV on this ground.

---

[111] Admittedly, the publicly available version of the New Agreement is redacted to conceal these financial terms. Once again, however, Plaintiff failed to use Section 220 to attempt to fill this informational void. Had Plaintiff done so, it presumably would have obtained this information, subject to entering an appropriate confidentiality agreement. *See* Tr. of Oral Arg. 63-64.

[112] For example, the Complaint includes quotations from an October 4, 2011, letter from, among others, the Interactive Travel Services Association and a purported industry expert's statements on May 5, 2011, and July 24, 2013, about the typical terms of a GDS services agreement. Compl. ¶¶ 64-65, 67. The Complaint does not allege the financial terms of such "typical" agreements.

[113] *See J.P. Stevens*, 542 A.2d at 780-81.

Plaintiff's refrain that "the members of the Board should have exercised the Company's leverage to secure a substantially more favorable GDS agreement"[114] is precisely the type of "Monday morning quarterbacking" that this Court routinely rejects as insufficient to establish demand futility.[115] "In the absence of well pleaded allegations of director interest or self-dealing, failure to inform themselves, or lack of good faith, the business decisions of the board are not subject to challenge because in hindsight other choices might have been made instead."[116]

### c. Demand Should Not Be Excused Simply Because the Challenged Transaction Involved an Alleged Controlling Stockholder

Plaintiff's third demand futility argument is that demand should be excused for Counts I-IV as a matter of law because the New Agreement was a conflicted transaction subject to entire fairness review.[117] Plaintiff advances two theories for the application of entire fairness, neither of which provides a basis for excusing demand in my view.

First, Plaintiff contends that entire fairness should apply because a majority of the ten directors on the Agreement Board were financially interested in the New Agreement or otherwise not independent from Travelport and/or Blackstone.[118] Accepting for the

---

[114] Pl.'s Ans. Br. 44.

[115] *See In re Affiliated Computer Servs., Inc. S'holders Litig.*, 2009 WL 296078, at *10 (Del. Ch. Feb. 6, 2009).

[116] *Id.*

[117] Pl.'s Ans. Br. 31.

[118] *Id.* 40.

sake of argument that the full board provides the appropriate frame of reference for determining the standard of review for the breach of fiduciary duty claim against the Agreement Board (Count II),[119] the Complaint fails to allege facts legitimately calling into question the independence or disinterestedness of at least six of the ten members of the Agreement Board (Britton, Esterow, Forbes, Gerstner, Leslie and Studenmund) for the reasons explained above.

Second, Plaintiff contends that demand should be excused under the second prong of *Aronson* because the New Agreement was a conflicted transaction in which Orbitz's controlling stockholder, Travelport, stood on both sides.[120] The logical extension of this argument is that demand would be excused as a matter of law whenever a transaction between a corporation and its putative controlling stockholder implicates the entire

---

[119] As discussed above, the reasonable inference from the Complaint is that the full board did not approve the New Agreement and that only the Audit Committee did so. Thus, the relevant focus for determining the standard of review for the breach of fiduciary duty claim asserted against the Orbitz directors in Count II is on the members of the Audit Committee, whose presumed independence, disinterestedness, and good faith Plaintiff failed to call into question for the reasons explained above. Thus, the business judgment standard would presumably govern Count II. *See In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 589 (Del. Ch. 2007) (observing that, where a majority of the compensation committee did not have disabling conflicts but where at least half of the full board did, the business judgment standard would govern if only the committee approved the compensation awarded to the managing general partner of the company's controlling stockholder).

[120] Pl.'s Ans. Br. 32.

fairness standard. Although this argument has some superficial appeal, it is inconsistent with controlling authority in my opinion.[121]

Under 8 *Del. C.* § 141(a), "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors." In *Zapata Corp. v. Maldonado*,[122] the Delaware Supreme Court observed that the "managerial decision making power" granted to directors by 8 *Del. C.* § 141(a) "encompasses decisions whether to initiate, or refrain from entering, litigation."[123] As noted above, because a derivative action infringes upon the board's managerial authority, Court of Chancery Rule 23.1 requires a derivative plaintiff to allege with particularity "the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[124]

Building on this core tenet of Delaware corporate law, the Supreme Court articulated in *Aronson* the now-familiar demand futility standard for a derivative claim challenging a decision of the board. In that case, the plaintiff challenged certain

---

[121] Given that the second prong of *Aronson* asks simply whether "the challenged transaction was otherwise the product of a valid exercise of business judgment," *Aronson*, 473 A.2d at 814, it is understandable how one might find that test to be satisfied whenever entire fairness review might be triggered, irrespective of the circumstances triggering such review or the nature of the claims to which such review might apply. The sole authority on which Plaintiff relies consists of a transcript ruling that appears to endorse this approach. I decline to follow this ruling because it is inconsistent in my opinion with controlling Supreme Court precedent for the reasons explained above.

[122] 430 A.2d 779 (Del. 1981).

[123] *Id.* at 782.

[124] Ct. Ch. R. 23.1.

agreements entered into between the company (Meyers) and a director (Fink), who also owned 47% of Meyers's common stock. The plaintiff alleged that Fink "dominated and controlled" each of the company's other nine directors, such that demand should be excused, because Fink "personally selected each director."[125] Analyzing the plaintiff's allegations, the Supreme Court appeared to assume that Fink, with his 47% ownership interest, was Meyers's controlling stockholder. The *Aronson* Court nevertheless squarely rejected the notion that a controlling interest in a corporation is itself sufficient to overcome the directors' presumption of independence:

> [I]n the demand context even proof of majority ownership of a company does not strip the directors of the presumptions of independence, and that their acts have been taken in good faith and in the best interests of the corporation. There must be coupled with the allegation of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person.[126]

After rejecting the plaintiff's allegations of Fink's control over the nine directors,[127] the Supreme Court found that the plaintiff's complaint failed to plead demand futility under Rule 23.1.

---

[125] *Aronson*, 473 A.2d at 808, 810.

[126] *Id.* at 815.

[127] *See id.* ("Here, plaintiff has not alleged any facts sufficient to support a claim of control. The personal-selection-of-directors allegation stands alone, unsupported. At best it is a conclusion devoid of factual support. The causal link between Fink's control and approval of the employment agreement is alluded to, but nowhere specified. The director's approval, alone, does not establish control, even in the face of Fink's 47% stock ownership.").

Twenty years later, in *Beam v. Stewart*,[128] the Delaware Supreme Court again addressed the effect of a controlling stockholder on a demand futility analysis, albeit outside the context of a self-dealing transaction. The *Beam* case involved a derivative claim for breach of fiduciary duty against the company's (MSO's) founder, chairman, and CEO (Martha Stewart) for allegedly jeopardizing MSO's financial future by illegally selling stock in another public corporation (ImClone) and mishandling the media attention that followed. The plaintiffs alleged that three other directors were not independent from Stewart for demand futility purposes because of alleged social and business relationships, and the fact that Stewart owned 94% of MSO's voting shares.

Citing to *Aronson*, the *Beam* Court's analysis began with the presumption that directors act independently and faithfully to their fiduciary duties.[129] The Supreme Court concluded that the alleged social and business relationships did not raise a reasonable doubt as to the independence of the three directors. Then, citing to the part of *Aronson* discussed above, the *Beam* Court firmly rejected the notion that Stewart's majority voting control in MSO alone overcame the other directors' presumed independence:

> Beam attempts to bolster her allegations regarding the relationships between Stewart and Seligman and Moore by emphasizing Stewart's overwhelming voting control of MSO. That attempt also fails to create a reasonable doubt of independence. A stockholder's control of a corporation does not excuse presuit demand on the board without particularized allegations of relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder. As noted earlier, the relationships alleged by Beam do not

---

[128] 845 A.2d 1040 (Del. 2004).

[129] *Id.* at 1048 (citing *Aronson*, 473 A.2d at 812).

lead to the inference that the directors were beholden to Stewart and, thus, unable independently to consider demand. Coupling those relationships with Stewart's overwhelming voting control of MSO does not close that gap.[130]

As *Aronson*, *Beam*, and Rule 23.1 make plain, the demand futility test under Delaware law focuses exclusively on whether there is a reasonable doubt that the directors could impartially respond to a demand. The fact that *Rales*, rather than *Aronson*, governs here is of no moment, because—regardless of the applicable test—the demand futility analysis focuses on whether there is a reason to doubt the impartially of the directors, who hold the authority under 8 *Del. C.* § 141(a) to decide "whether to initiate, or refrain from entering, litigation."[131] Under these authorities, neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry.

For the reasons explained above, the fact that Travelport arguably held a controlling interest in Orbitz when it entered into the New Agreement does not affect the demand futility analysis for Counts I-IV. Stated differently, the potential that the entire fairness standard may govern Plaintiff's breach of fiduciary duty claim against Travelport

---

[130] *Id.* at 1054 (citing *Aronson*, 473 A.2d at 815).

[131] *Zapata*, 430 A.2d at 782. Indeed, in *Guttman*, then-Vice Chancellor Strine explained that, although the "*Rales* test looks somewhat different from *Aronson*, in that [it] involves a singular inquiry[,] . . . that singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*." *Guttman*, 823 A.2d at 501; *see also David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ("[T]he *Rales* test, in reality, folds the two-pronged Aronson test into one broader examination."), *aff'd*, 911 A.2d 802 (Del. 2006) (TABLE). Given this reality, our jurisprudence would benefit in my view from the adoption of a singular test to address the question of demand futility.

41

as an alleged controlling stockholder (Count I) does not remove that claim, or any of the other derivative claims (Counts II-IV), from the purview of the Demand Board to decide for themselves under 8 *Del. C.* § 141(a) whether to exercise the Company's right to bring such a claim. The focus instead, as explained in *Aronson* and repeated in *Beam*, is on whether Plaintiff's allegations raise a reasonable doubt as to the impartially of a majority of the Demand Board to have considered such a demand. For the reasons set forth above, Plaintiff has not done so in my view for any of Counts I-IV.

\* \* \*

In sum, after accepting as true Plaintiff's particularized allegations of fact and drawing all reasonable inferences from those allegations in Plaintiff's favor, I conclude that Plaintiff has failed to raise a reasonable doubt under *Rales* as to the ability of a majority of the Demand Board to have impartially considered a demand as to all of Counts I-IV.[132]

---

[132] Even if I were to analyze Plaintiff's claims under the two prongs of the *Aronson* test (*i.e.*, if the New Agreement had been approved by the entire Agreement Board), my conclusions would be no different. To plead demand futility under *Aronson*, Plaintiff must allege particularized facts that raise a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. For the reasons explained above, Plaintiff failed to satisfy the first prong of *Aronson* because it failed to raise a reasonable doubt as to the independence or disinterestedness of a majority of Orbitz's directors when this action was filed (Britton, Esterow, Forbes, Gerstner and Leslie) and Plaintiff failed to satisfy the second prong because it failed to raise a reasonable doubt that the New Agreement was approved in bad faith.

42

## B. Count V Fails to State a Claim for Relief

In Count V of the Complaint, Plaintiff asserts that the members of the Current Board breached their fiduciary duties by determining that Brand, Esterow, and Friedman were "independent" under the NYSE Rules.[133] Plaintiff contends that this claim is both direct and derivative. As to the former, Plaintiff submits it has alleged direct injury from material misstatements in the Company's 2014 proxy statement, "which solicited stockholder votes in connection with the election of directors," because that proxy "falsely claimed that three incumbent directors—Brand, Esterow, and Friedman—were independent when, in reality, they were not."[134] As to the latter, Plaintiff argues that it has alleged derivative injury from violations of the NYSE Rules, under the theory that "directors act in bad faith, and breach their fiduciary duty of loyalty, when they violate regulations applicable to their company."[135] I need not resolve whether Plaintiff's claim

---

[133] Compl. ¶ 157. Count V also alleges that the members of the Current Board breached their fiduciary duties by failing to replace the director vacancy created by Studenmund's resignation from the board and by failing to comply with the Company's Guidelines in certain respects. *Id.* Plaintiff did not advance any argument in its brief concerning either of these issues; thus, those aspects of Count V are waived. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). There is no affirmative duty under Delaware law, moreover, for a board to fill a director vacancy. *See In re Aquila Inc. S'holders Litig.*, 805 A.2d 184, 191 (Del. Ch. 2002) (holding that directors "had no identifiable duty to appoint anyone to the board of directors" even though the company failed to "form an audit committee comprised of at least two independent directors within three months of listing" as required by the NYSE Rules).

[134] Pl.'s Ans. Br. 61.

[135] *Id.* 63.

43

is direct or derivative (or both) because the claim must be dismissed under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.[136]

Significantly, Plaintiff does not assert that the 2014 proxy statement failed to accurately disclose all material facts relevant to assessing the independence of any of Orbitz's directors under Delaware law,[137] such as facts concerning the nature of their relationships, if any, with Travelport or Blackstone. Thus, Plaintiff's challenge to the propriety of an independence determination under the NYSE Rules does not undermine the sufficiency of the disclosures in the 2014 proxy statement. For this reason, the authorities on which Plaintiff relies, which involved allegations that directors omitted or misstated material information when soliciting stockholder action, are plainly distinguishable.[138]

---

[136] Defendants' motion to dismiss Count V under Court of Chancery Rule 12(b)(6) must be denied unless, accepting as true all well-pled allegations of the Complaint and drawing all reasonable inferences from those allegations in Plaintiff's favor, there is no "reasonably conceivable set of circumstances susceptible of proof" in which Plaintiff could recover. *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[137] *See, e.g.*, *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992) ("Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote.").

[138] *See In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *16 (Del. Ch. July 24, 2014) (denying the defendants' motion to dismiss a claim that stockholder approval of an incentive compensation plan, which was required under the NYSE Rules, was invalid due to material misstatements about the CEO's bonus agreement in the relevant proxy statement); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*, 824 A.2d 11, 18 (Del. Ch. 2002) (granting summary judgment to plaintiff because the proxy statements for two annual meetings omitted material information about an extraneous relationship between two directors, one deemed "interested," and the other deemed "independent," under the Investment Company Act of 1940).

The actual harm alleged in Count V is that the Orbitz board improperly determined that Brand, Esterow, and Friedman were "independent" under NYSE Rule 303A.02 such that, because Baiera and Harford were determined to not be "independent," the Orbitz board does not have a majority of "independent" directors as required by NYSE Rule 303A.01. In essence, Plaintiff challenges the substance of the board's determination of independence for Brand, Esterow, and Friedman under the NYSE Rules. Thus, if this case were to proceed, Plaintiff would need to establish that the Current Board violated the NYSE Rules.

"The NYSE is registered with the Securities and Exchange Commission . . . as a national securities exchange pursuant to [S]ection 6 of the Exchange Act. As a registered exchange, the NYSE is deemed by the Exchange Act a self-regulatory organization."[139] In effect, this means that the NYSE is responsible for maintaining the compliance of listed companies with the NYSE Rules. For example, under NYSE Rule 303A.13, the NYSE may issue a public reprimand letter to a listed company that violates NYSE Rule 303A.01. Here, Plaintiff has not alleged that the NYSE has, by public reprimand letter or otherwise, informed Orbitz that it is in violation of the NYSE Rules. In other words, the Complaint fails to allege any indication from the NYSE that Orbitz has done anything wrong under the NYSE Rules. Nor has Plaintiff alleged a contract-based claim with respect to the board's independence determinations, such as a violation of the Orbitz

---

[139] *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007) (citing 15 U.S.C. §§ 78f, 76c(a)(26)).

45

Charter or the Company's bylaws.[140] Thus, to prove its breach of fiduciary duty claim, Plaintiff would be prosecuting the functional equivalent of a claim to enforce the NYSE Rules. In my view, Plaintiff has no standing to do so.

Plaintiff cites no authority from Delaware or any other jurisdiction that supports the proposition that a violation of the NYSE Rules in the circumstances alleged here could sustain a claim for breach of fiduciary duty. In the only case Defendants have identified in which this Court considered a related issue, *In re Aquila Inc. Shareholders Litigation*,[141] the plaintiffs conceded they had "no standing directly to bring an action to enforce the NYSE rules or to seek sanctions for any alleged violation thereof."[142] Defendants also point to federal case law, which has observed that "courts in [the Third Circuit] have 'unanimously refused to recognize any private right of action for violation of a stock exchange rule.' "[143] I find this federal authority to be persuasive, and I

---

[140] *See DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *23 n.97 (Del. Ch. Sept. 30, 2013) (noting that, where a limited partnership agreement incorporated the definition of "independent" under the NYSE Rules, and where that agreement required the general partner's board to have a majority of independent directors, the failure to satisfy this charter obligation would be a breach of contract).

[141] 805 A.2d 184 (Del. Ch. 2002).

[142] *Id.* at 192 n.11 (addressing a contract-based claim for the board's failure to appoint two directors who would qualify as "independent" under the NYSE Rules where the corporation's charter required the majority stockholder's right to nominate a majority of directors under the charter to be exercised "in a manner to ensure compliance by the Corporation with . . . the requirements of any securities exchange to which the Corporation is then subject").

[143] *Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, *11 (E.D. Pa. Dec. 3, 2009) (quoting *In re Farmers Gp. Stock Options Litig.*, 1989 WL 73245, at *3 (E.D. Pa. July 5, 1989)); *see also Witt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 602 F. Supp. 867,

likewise conclude that Plaintiff has no standing to prosecute a violation of the NYSE Rules.

It is true that, under Delaware law, "one cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey."[144] But, as noted above, the Complaint does not allege that the NYSE, as a self-regulatory organization, has indicated that Orbitz violated the NYSE Rules and Plaintiff has no standing to assert or prove that Orbitz violated the NYSE Rules. Thus, I conclude that it is not reasonably conceivable that Plaintiff could establish that the Current Board caused the Company to violate the NYSE Rules. *A fortiori*, I conclude that Count V fails to allege a reasonably conceivable claim for breach of fiduciary duty by the Current Board with respect to the NYSE Rules.

## IV. CONCLUSION

For the foregoing reasons, the Orbitz Defendants' motion to dismiss Count II of the Complaint under Rule 23.1 is GRANTED, and their motion to dismiss Count V of the Complaint under Rule 12(b)(6) is GRANTED. The Travelport and Blackstone Defendants' motion to dismiss Counts I, III, and IV of the Complaint under Rule 23.1 also is GRANTED.

**IT IS SO ORDERED**.

---

869 (W.D. Pa. 1985) ("[T]here is no private right of action against defendants, either express or implied, under the New York Stock Exchange . . . Rules [for alleged violations of NYSE Rules 405 and 435].").

[144] *Guttman*, 823 A.2d at 506 n.34.

47