**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

Leonard L. Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: June 2, 2017
Date Decided: August 1, 2017

Ned Weinberger, Esquire
Thomas Curry, Esquire
Labaton Sucharow LLP
300 Delaware Avenue, Suite 1340
Wilmington, DE 19801

Anne C. Foster, Esquire
Brian F. Morris, Esquire
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

RE: ***H&N Management Group, Inc. & Aff Cos Frozen Money Purchase Plan v. Robert M. Couch et al.,*** Civil Action No. 12847-VCMR

Dear Counsel:

This letter opinion addresses Defendants' motion to dismiss Plaintiff H&N Management Group, Inc. & Aff Cos Frozen Money Purchase Plan ("H&N")'s Verified Amended Stockholder Derivative Complaint (the "Complaint") for failure to make demand under Court of Chancery Rule 23.1 and failure to state a claim for breaches of fiduciary duty under Court of Chancery Rule 12(b)(6). For the reasons discussed below, I hold that Plaintiff has sufficiently alleged a reason to doubt the board was adequately informed when approving each transaction at issue. Because the relevant exculpation provision does not protect the board from liability for gross negligence, and Plaintiff has met the heightened pleading standard for demand futility under *Aronson v. Lewis*, I deny the defendants' motion to dismiss.

## I.   BACKGROUND

The facts are taken from the Complaint and all documents incorporated therein.[1]   Plaintiff H&N is a stockholder of AGNC Investment Corp. (the "Company"), a Delaware real estate investment trust ("REIT") that invests primarily in mortgage-backed securities.  The Company was externally managed by American Capital Mortgage Management, LLC (the "Manager"), a wholly-owned subsidiary of the private equity firm, American Capital, Ltd. ("American Capital").  The Manager also managed another REIT, American Capital Mortgage Investment Corporation ("MTGE").  Defendant Malon Wilkus founded American Capital and serves as its Chairman and CEO.  Wilkus also was the CEO of the Company and MTGE until March 2016 and the CEO of the Manager until September 2016.

From February 2013 until May 2016, the Company and MTGE had the same board.  In March 2016, Defendant Gary Kain became CEO, President, Chief Investment Officer ("CIO"), and a director of the Company and MTGE.  Kain has been President of the Manager since 2011; and he served as a Senior Vice President and Managing Director of American Capital from January 2009 to July 2009.

---

[1]    *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

The Manager managed the operations of both the Company and MTGE, as neither had employees of their own. The Manager managed the Company pursuant to an agreement executed on May 20, 2008, and amended on July 29, 2008 and September 30, 2011 (the "Management Agreement"). The Management Agreement specifically allowed for termination after the initial term ended in 2011; but the agreement was renewed each year through the 2016 term (the "Renewals"). On July 1, 2016, the Company acquired the Manager in a $562 million cash deal (the "Internalization"), and the Manager's subsidiary continued to manage MTGE.

Plaintiff filed this action on October 21, 2016. On December 12, 2016, Plaintiff filed the operative Complaint. Plaintiff alleges that the individual defendants breached their fiduciary duties by allowing the agreement to automatically renew for the years 2014, 2015, and 2016. Plaintiff argues that the Company was overpaying for the Manager's services and bankrolling MTGE's operations year after year. Plaintiff contends that the board did not consider all material information and did not have access to the entire financial picture when deciding whether to renew. Plaintiff also alleges that certain individual defendants knowingly withheld material information from the board, including the Company's payment of more than double the Manager's costs.

The Complaint also asserts that the individual Defendants did not act in the best interests of the Company when considering the Internalization. Rather, Plaintiff alleges that the Defendants acted collectively for MTGE and the Company, even though the two entities had diverging interests. Plaintiff argues that the Company unnecessarily paid an exorbitant amount for the Manager while MTGE, a competing REIT, paid nothing. Plaintiff contends that much more reasonable options were available, such as the termination of the Management Agreement. Finally, Plaintiff alleges that the Internalization constituted waste because the terms of the transaction were so lop-sided that no person acting in good faith would have approved the deal.

On January 12, 2017, Defendants filed their motion to dismiss. Defendants assert that the majority of the board is disinterested, is independent, and does not face a substantial threat of liability from either the Renewals or the Internalization. Therefore, in Defendants' view, Plaintiff has failed to plead demand futility. Additionally, Defendants move to dismiss on the grounds that Plaintiff has failed to state a claim for breach of fiduciary duty or waste. On June 2, 2017, the Defendants filed a letter correcting their opening brief, and this Court held oral argument.

## II.    ANALYSIS

In order to bring a derivative action under Rule 23.1, a stockholder must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action

the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[2] In considering a motion to dismiss under Rule 23.1, "[t]he Court must assume the truthfulness of all well-pleaded facts in the complaint and is required to make all reasonable inferences that logically flow from the face of the complaint in favor of the plaintiff."[3] The Complaint does not allege that Plaintiff made demand on the Company's board. Therefore, in order for this action to go forward, Plaintiff must allege that demand on the board is futile.

"Under Delaware law, the Court applies one of two tests to determine whether a plaintiff's demand upon the board would be futile."[4] "[W]hen a plaintiff is challenging a decision of the board of directors," the two-prong *Aronson v. Lewis* test applies.[5] Under *Aronson*, demand is futile if "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid

---

[2]     Ct. Ch. R. 23.1(a).

[3]     *McPadden v. Sidhu*, 964 A.2d 1262, 1269 & n.7 (Del. Ch. 2008).

[4]     *Reiter ex rel. One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at \*6 (Del. Ch. Oct. 18, 2016).

[5]     *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)).

exercise of business judgment."[6]

The *Rales v. Blasband* test applies, however, "where the board that would be considering the demand did not make a business decision which is being challenged in the derivative suit."[7]  Specifically, this type of situation arises

> (1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation.[8]

Under *Rales*, the inquiry is whether "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand."[9]

To survive a motion to dismiss under Rule 12(b)(6), the Court accepts all "well-pleaded factual allegations" as true.[10]  "[E]ven vague allegations are 'well-

---

[6]      *Aronson*, 473 A.2d at 814.

[7]      *Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993).

[8]      *Id*.

[9]      *Id.* at 934.

[10]     *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

pleaded' if they give the opposing party notice of the claim."[11] "[T]he Court must draw all reasonable inferences in favor of the non-moving party;" and the Court cannot dismiss the case "unless 'the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[12] If the complaint survives the "more onerous" pleading standard required by Rule 23.1, "assuming that it otherwise contains sufficient facts to state a cognizable claim,"[13] it necessarily will survive the Rule 12(b)(6) notice pleading standard.[14] Thus, "the issue of whether demand is futile so as to be excused is logically antecedent to whether plaintiff states a claim because, if demand is not made or is not otherwise excused, the complaint will be dismissed without any further inquiry into the merits of the complaint."[15] Therefore, I analyze the claims under demand futility first.

---

[11]     *Id.*

[12]     *Id.*

[13]     *McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008) (citing *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007)).

[14]     *Id.* at 1269-70 (citing *Gen. Motors*, 897 A.2d at 168)).

[15]     *Id.* at 1270 (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)).

"[U]nder Delaware law, the demand futility analysis 'is conducted on a claim-by-claim basis.'"[16]  Here, Plaintiff challenges the board's annual review process in allowing the Renewals and the board's decision to approve the Internalization.  The current board approved the Internalization and three of the four current directors, approved the Renewals.[17]  Thus, the *Aronson* test applies to each of the Renewals and the Internalization.[18]

Here, Plaintiff argues that demand is excused under *Aronson*'s second prong because there is a reasonable doubt that the Renewals and the Internalization were the products of the valid exercise of business judgment.[19]  Under the second prong

---

[16]     *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 n.71 (Del. Ch. 2015) (quoting *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014)).

[17]     *Teachers' Ret. Sys. of Louisiana v. Aidinoff*, 900 A.2d 654, 666 (Del. Ch. 2006) ("One of the reasons why contracts have termination clauses is to permit a fresh business decision to be made about continuing past practices.  Here, the complaint clearly pleads that the AIG board breached its fiduciary duties by deciding to continue dealings with Starr, even though the MGA Agreements gave them the opportunity to stop.").

[18]     The parties dispute whether *Aronson* or *Rales* applies.  "Whether the *Rales* test or the *Aronson* test applies ultimately makes no substantive difference in my view because 'the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination.'"  *Reiter ex rel. Capital One Fin. Corp. v. Fairbank*, 2016 WL 6081823, at *6 n.35 (Del. Ch. Oct. 18, 2016) (quoting *Baiera*, 119 A.3d at 67 n.131); *see also Ryan v. Armstrong*, 2017 2062902, at *14 & n.144 (Del. Ch. May 15, 2017).

[19]     Pl.'s Answering Br. 28-58.

of *Aronson*, "plaintiffs must plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."[20] When considering whether the board was adequately informed, "[p]re-suit demand will be excused in a derivative suit only if the . . . particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, *measured by concepts of gross negligence,* included consideration of all material information reasonably available."[21]

### A. Plaintiff Has Raised a Reason to Doubt that the Board was Adequately Informed When Approving the Renewals

Plaintiff alleges that demand is excused as to the Renewals because: (1) the board did not adequately inform itself before making the decision to continue the Management Agreement; and (2) the majority of the board also was on the MTGE board and, thus, had the "dual fiduciary problem identified in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)."[22]

---

[20] *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).

[21] *In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *15 (Del. Ch. Oct. 12, 2011) (quoting *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000)).

[22] Pl.'s Answering Br. 29 (citing *In re Trados S'holder Litig.*, 73 A.3d 17, 46 (Del. Ch. 2013)).

The initial term of the Management Agreement ended on May 20, 2011, but Section 10(b) of the Management Agreement provided: "After the Initial Term, this Agreement shall be deemed renewed automatically each year for an additional one-year period (an "*Automatic Renewal Term*") unless the Company or Manager elects not to renew this Agreement."[23] The Management Agreement provided that after the initial term, either the Company or the Manager "may, without cause, in connection with the expiration of the Initial Term or any Automatic Renewal Term, decline to renew this Agreement."[24] If the Company terminated the agreement, it was obligated to pay a Termination Fee that was three times the average annual management fee paid to the Manager during the prior 24-month period.[25]

Every year in October, the Company's Compensation and Corporate Governance Committee (the "Compensation Committee") met to decide whether to renew the Management Agreement on its existing terms. An examination of the minutes reveals the same process for each review for the years 2013, 2014, and 2015. The Compensation Committee consisted of people on both the boards of the

---

[23]     Compl. n.3.

[24]     Morris Aff. Ex. 3, at 20.

[25]     *Id.*

Company and MTGE. The Compensation Committee met for 15 minutes or less either concurrently with or after the board meeting.[26] The minutes do not reflect any pause, break out session, or other opportunity to suggest that the Compensation Committee further considered the Renewals. At the 2015 and 2016 renewal meetings, a 250-page slide deck was included in the Compensation Committee's materials but distributed only during the brief meetings. The slide decks were prepared by the Manager that the Compensation Committee was considering firing. The Compensation Committee never had any advisor, despite the fact that this was the company's biggest business decision (in terms of expenditures) every year. Each year, the Compensation Committee recommended that the board approve the Renewals, and each year, the board approved the Renewals.

Further, Plaintiff contends that the Company was subsidizing the management of MTGE because the Company paid over $100 million in management fees annually, whereas MTGE paid less than $20 million, which on its own, would not cover the Manager's costs.[27] Also, Plaintiff maintains that the Company and MTGE

---

[26]   For example, at the 2014 renewal meeting, the Compensation Committee met an hour-and-a-half after the full board meeting for fifteen minutes. Compl. ¶ 59. At the 2015 meeting, they met concurrently with the board for ten minutes without adjourning the full board meeting. Compl. ¶ 70.

[27]   Under the Management Agreement, the Company pays monthly management fees to the Manager equal to one-twelfth of 1.25% of the Company's month-end

were competitors in the agency-backed securities market, and this arrangement gave MTGE investment opportunities to which it otherwise would not have access.

Defendants respond that (1) the board adequately considered the Renewals and did not act in bad faith or with gross negligence; and (2) there is no material conflict because MTGE's and the Company's interests were aligned with respect to the Renewals. Defendants argue that Plaintiff's reading of the board minutes is "tortured" and that the board had adequate information regarding the Manager's performance to consider whether to incur the termination fee or keep a well-performing manager in place. Additionally, Defendants contend that the Company and MTGE both were incentivized to keep the Manager within the fold, and any fee paid by MTGE was well within market rates.[28]

---

stockholders' equity, adjusted to exclude the effect of any unrealized gains or losses included in retained earnings or other comprehensive income. American Capital and Wilkus entered into a similar arrangement for the Manager to manage MTGE; however, MTGE's monthly fee was one-twelfth of 1.5% of its month-end stockholders' equity, rather than 1.25%. MTGE is significantly smaller than the Company—whereas the Company paid over $100 million in fees to the Manager annually ($113 million, $136 million, $119 million, and $116 million in 2012, 2013, 2014, and 2015, respectively), MTGE paid less than $20 million annually ($10 million, $19 million, $18 million, and $17 million, in each of these years, respectively). Compl. ¶¶ 25, 32.

[28]  Defs.' Reply Br. 18-20, 23-24.

In order to rule in Defendants' favor, I would need to read words into the Compensation Committee minutes that do not appear and take inferences in their favor. At this stage in the pleadings, I must take all reasonable inferences in favor of the non-moving party. Plaintiff alleges that for the board's biggest yearly decision, (1) the Compensation Committee met briefly as a formality during or after the board meeting; (2) the Compensation Committee did not retain advisors; (3) the Compensation Committee was conflicted because non-renewal would directly affect MTGE, a company to which all the members also owed fiduciary duties; (4) the Compensation Committee received its only information (which it did not have time to review in the meeting) from the self-interested Manager; and (5) the Compensation Committee purportedly relied on the previous year's "review," even though a detailed review never occurred. The Complaint alleges particularized facts sufficient to raise a reason to doubt that the board was adequately informed in its consideration of the Renewals. Thus, demand on the board is futile under *Aronson*.

**B.  Plaintiff Has Raised a Reason to Doubt that the Board was Adequately Informed When Approving the Internalization**

Plaintiff argues that demand is excused as to the Internalization because (1) the committee that considered the transaction breached its duty of care; (2) Wilkus and Kain breached their fiduciary duties; (3) the committee members acted in bad faith by working for the collective interests of MTGE and the Company in approving

the Internalization; and (4) the board committed waste.[29]

On November 25, 2015, American Capital announced that it was conducting a "full strategic review of all alternatives,"[30] including a possible sale. In response to American Capital's announcement, the Company and MTGE formed a joint subcommittee to act on behalf of both companies consisting of board members of both the Company and MTGE (the "Joint Committee"). The Joint Committee retained legal and financial advisors to advise the Company and MTGE "in their strategic planning and evaluation of potential alternatives . . . ."[31]

The Joint Committee met for the first time on March 6, 2016 and noted that "no significant information had been provided by American Capital or its advisors . . . despite multiple requests that had been made by individual directors and their attorneys."[32] Minutes from a meeting three days later state that an American Capital special committee member wanted to give information to the Joint Committee but that "Wilkus had prevented him from providing more information to the Funds about

---

[29]     Pl.'s Answering Br. 49.

[30]     Compl. ¶ 91.

[31]     *Id.* ¶ 100.

[32]     *Id.* ¶ 105.

the American Capital strategic review process."[33]

The March 15, 2016 meeting minutes state:

> Goldman Sachs and Credit Suisse stated that if the Funds do not work with [American Capital], the Funds would be treated as a counterparty and no information would be provided to the Funds about the [American Capital] strategic review process until such time that the consent of the independent directors is requested to approve the potential purchaser. . . .

> Mr. Wilkus and Mr. Flax were surprised and upset at the Funds' initiating their own process.[34]

At the March 15, 2016 Joint Committee meeting, the committee discussed Kain's expression of "his preference for internalization of the managers by the Funds, and that he believed that to be the optimal solution for the Funds' respective shareholders."[35] At the March 16, 2016 Joint Committee meeting, Kain informed a committee member that he "had received instructions to pursue the internalization of the managers with the funds."[36] On March 17, 2016, Wilkus resigned as CEO of the Company and MTGE, and Kain was appointed CEO, CIO, President, and a

---

[33] *Id.*

[34] Morris Aff. Ex. 22, at 1.

[35] *Id.* at 2.

[36] Compl. ¶ 113.

director of the Company and MTGE. Kain also served as President of the Manager during that time.[37]

At the March 23, 2016 Joint Committee meeting, a committee member "conveyed Mr. Kain's strong desire for [the Company] and [MTGE] to internalize its managers."[38] At the March 25, 2016 Joint Committee meeting, J.P. Morgan's representative "proposed that Mr. Kain be asked to conduct an analysis on internalization, refine the analysis with J.P. Morgan, and then present it to the independent directors of the Funds."[39] The Joint Committee unanimously agreed. At the March 30, 2016 meeting, the Joint Committee requested that J.P. Morgan "work[] with Messrs. Kain and Federico to present an internalization proposal to the Funds."[40]

At an April 10, 2016 meeting, J.P. Morgan and Jones Day outlined four options: (1) joint acquisition of the Manager by the Company and MTGE; (2) sole

---

[37] Kain was promoted to CEO of the Manager on July 1, 2016. Compl. n.25. As of January 1, 2016, Kain's annual base salary from the Manager was $4,384,744.00 with incentive compensation tied to the performance of the Company and MTGE that was several times greater than his base salary. *Id.* n.26.

[38] Compl. ¶ 115.

[39] *Id.*

[40] *Id.* ¶ 116.

acquisition of the Manager by the Company, which would then externally manage MTGE; (3) sole acquisition of the Manager by the Company and the liquidation of MTGE; and (4) liquidation of both the Company and MTGE. The Joint Committee deferred deciding which avenue to pursue "until J.P. Morgan had an opportunity to review the liquidation analysis conducted by Gary Kain and the independent directors had an opportunity to have further discussions with J.P. Morgan . . . ."[41]

By the next day, the Joint Committee had decided to pursue internalization and at an April 11, 2016 meeting, Kain told the Joint Committee that "he believed a safe, clearing level purchase price [for the Manager] would be around $600 to $650 million, but given the situation and the steps of the Funds thus far, a purchase price of $525 to $550 million could also be acceptable to [American Capital]."[42] Kain also stated "that a price in the $400 million range would be too close to what [American Capital] is entitled to under the management agreement."[43]

At the April 14, 2016 meeting, the directors agreed to submit an initial bid of $500 million to American Capital. American Capital rejected this initial bid.

---

[41]     *Id.*

[42]     *Id.* ¶ 120.

[43]     *Id.*

Subsequently, a $575 million bid was made and agreed to by American Capital. At the April 22, 2016 meeting, Kain "shared with the group that his preferred transaction structure would be for [the Company] to purchase [the Manager] and manage MTGE externally."[44] J.P. Morgan delivered its fairness opinion as to the purchase price of the Manager based on an evaluation of the Manager's "standalone prospects as an independent entity" with a discounted cash-flow analysis based on the external management contracts with the Company and MTGE.[45] J.P. Morgan stated that the "intrinsic value" of the Manager was between $636 million and $787 million. The Company eventually agreed to pay $562 million in cash to acquire the Manager, with the Manager's subsidiary continuing to manage MTGE under the existing fee arrangement. The Internalization was completed on July 1, 2016.

Similar facts have been presented to this Court. Specifically, in *McPadden v. Sidhu*, the board at issue allowed a conflicted manager, whose affiliate ended up buying the company's subsidiary, to lead the sales process with minimal oversight.[46] This, the Court found, was enough to plead a duty of care violation and created a

---

[44]    *Id.* ¶ 124.

[45]    *Id.* ¶ 125.

[46]    964 A.2d 1262 (Del. Ch. 2008).

reasonable doubt that the transaction was the product of a valid exercise of business judgment, rendering demand futile.[47]  As in *McPadden*, the Joint Committee here was fully aware of Kain's conflict as a fiduciary of the Company, MTGE, and the Manager; yet the Joint Committee allowed him to dominate their process, dictate the transaction structure, and direct the ultimate deal terms.[48]  Kain repeatedly stressed his "strong desire" for internalization as "his preferred transaction structure" and that he had "received instructions" to pursue the Internalization.[49]  The Joint Committee knew that the investment banker's analysis was prepared "at the direction" of Kain. In fact, the Joint Committee directed J.P. Morgan to work with Kain to present an internalization proposal.[50]  Kain then suggested a price range that would be palatable to American Capital, and the Joint Committee accepted it.  These facts are sufficient to raise a reason to doubt that the board was adequately informed when it approved the Internalization.  Thus, demand is futile as to the Internalization.

---

[47]     *Id.* at 1270-71.

[48]     *Id.*

[49]     Compl. ¶¶ 113, 115, 124.

[50]     *Id.* ¶ 116; *see McPadden*, 964 A.2d at 1272.

### C. The Complaint States a Claim for Breach of Fiduciary Duty

Because Plaintiff has alleged particularized facts sufficient to excuse demand based on potential breaches of the duty of care with regard to both the Renewals and the Internalization, Plaintiff meets the lesser pleading standard required by Rule 12(b)(6).[51] Defendants do not benefit from a provision that exculpates them for grossly negligent conduct; therefore, the complaint proceeds against the Defendants.

## III. CONCLUSION

For the foregoing reasons, I hold that Plaintiff has adequately alleged that demand is futile under *Aronson* and stated a claim for breach of fiduciary duty against Defendants. Thus, the motion to dismiss is denied.

**IT IS SO ORDERED**.

Sincerely,

*/s/Tamika Montgomery-Reeves*

Vice Chancellor

TMR/jp

---

[51] *See McPadden*, 964 A.2d at 1269-70.