# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CHESTER COUNTY EMPLOYEES' RETIREMENT FUND, )
)
)
Plaintiff, )
)
v. )   C.A. No. 11058-VCMR
)
NEW RESIDENTIAL )
INVESTMENT CORP., WESLEY R. )
EDENS, MICHAEL NIERENBERG, )
ALAN L. TYSON, DAVID )
SALTZMAN, KEVIN J. FINNERTY, )
DOUGLAS L. JACOBS, FIG LLC, )
FORTRESS INVESTMENT GROUP )
LLC and FORTRESS OPERATING )
ENTITY I LP, )
)
Defendants. )

## MEMORANDUM OPINION

Date Submitted: July 7, 2017
Date Decided: October 6, 2017

Michael Hanrahan, Paul A. Fioravanti, Jr., Corinne Elise Amato, and Kevin H. Davenport, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Marc A. Topaz, Lee D. Rudy, Michael C. Wagner, and Stacey A. Greenspan, KESSLER TOPAZ MELTZER & CHECK LLP, Radnor, Pennsylvania; *Attorneys for Plaintiff.*

Robert S. Saunders, Ronald N. Brown, III, Sarah R. Martin, and Elisa M.C. Klein, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Scott D. Musoff, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for Defendants.*

**MONTGOMERY-REEVES, Vice Chancellor.**

In this action, a stockholder of New Residential Corp. ("New Residential") purports to assert direct and derivative breach of fiduciary duty claims against the members of the New Residential board of directors, New Residential's manager FIG LLC ("FIG"), FIG's owner Fortress Operating Entity I LP ("FOE I"), and Fortress Investment Group LLC ("Fortress"), which allegedly controls New Residential, FIG, and FOE I. Plaintiff alleges that the Defendants caused New Residential to overpay for the assets of Home Loan Servicing Solutions, Ltd. ("HLSS") in order to advantage other real estate assets of Fortress and to maximize management fees, incentive compensation, and stock option awards to Fortress and its affiliates. Plaintiff also seeks a declaratory judgment that a termination agreement between HLSS and New Residential purporting to release all New Residential stockholder claims against HLSS is not a valid defense in this action.

Defendants move to dismiss this complaint under Court of Chancery Rules 23.1 and 12(b)(6). Defendants argue that all of Plaintiff's claims are derivative claims for corporate overpayment. Defendants contend that a majority of the New Residential board is disinterested and independent, and that even if a majority of the board is beholden to Fortress, Fortress is not interested in the underlying transactions. Defendants also argue that the complaint should be dismissed as to Fortress, FOE I, and FIG because they are not controlling stockholders and do not owe fiduciary duties to New Residential. As to the declaratory judgment claim,

2

Defendants contend that Plaintiff's claim is not ripe because Defendants have not raised the termination agreement as a defense.

In this Memorandum Opinion, I hold that the facts alleged give rise to a derivative claim. Plaintiff, however, has not pled particularized facts sufficient to raise a reasonable doubt that a majority of the directors on the New Residential board could have exercised their independent and disinterested business judgment in responding to a demand. As a result, demand is not excused as futile. Further, I hold that Plaintiff's declaratory judgment claim is not ripe for judicial review. As such, I grant Defendants' Motion to Dismiss.

## I.    BACKGROUND

This is Plaintiff's third opportunity to challenge New Residential's purchase of the HLSS assets and related transactions. Plaintiff filed its original Complaint in this case on May 22, 2015 and its First Amended Complaint on October 30, 2015. I granted Defendants' Motion to Dismiss the First Amended Complaint with leave to amend on October 7, 2016 (the "First Opinion").[1] After I denied Plaintiff's Motion for Reargument on December 1, 2016 (the "Second Opinion"),[2] Plaintiff filed the Second Amended Verified Class Action and Derivative Complaint (the

---

[1]    *Chester Cnty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004 (Del. Ch. Oct. 7, 2016).

[2]    *Chester Cnty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 7011350 (Del. Ch. Dec. 1, 2016).

3

"Complaint") on February 27, 2017. On March 30, 2017, Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rule 23.1 for failure to bring pre-suit demand and Rule 12(b)(6) for failure to state a claim upon which relief can be granted, and I heard oral argument on the Motion to Dismiss on July 7, 2017. This Memorandum Opinion assumes familiarity with the facts outlined in the First and Second Opinions and focuses on those facts pertinent to the resolution of the pending Motion to Dismiss.[3] "The reader is forewarned that this case involves a maze of corporate entities and an alphabet soup of corporate names."[4]

## A. Parties and Significant Non-Parties

Chester County Employees' Retirement Fund (the "Plaintiff") is, and at all relevant times has been, a holder of New Residential common stock.[5]

---

[3] Unless otherwise noted, the additional facts in this opinion derive from Plaintiff's Complaint and the documents it incorporates by reference. At times, I rely upon certain extraneous documents that are properly before the Court because they are integral to Plaintiff's claims and incorporated by reference into the Complaint. *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 659 n.3 (Del. Ch. 2013) ("To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents."); *see In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[4] *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *2 (Del. Ch. Sept. 18, 2014).

[5] Compl. ¶ 11.

Nominal defendant New Residential was spun-off to non-party Newcastle Investment Corp.'s ("Newcastle") stockholders on May 15, 2013.[6] New Residential is a Delaware publicly traded Real Estate Investment Trust ("REIT") that primarily invests in excess mortgage servicing rights ("Excess MSRs"), residential mortgage-backed securities ("RMBS"), call rights for RMBS that are not backed by a government agency, and a pool of consumer loans.[7] New Residential is a permanent capital vehicle in a web of Fortress entities.[8] New Residential has no employees and is "completely reliant on" FIG to manage its assets.[9]

Defendant FIG externally manages New Residential pursuant to a contractual management agreement.[10] Defendant FOE I "100% own[s]" FIG, is FIG's sole managing member, and holds New Residential stock options granted to FIG.[11] Non-

---

[6]     *Id.* ¶ 12.  Newcastle allegedly is controlled by Fortress.  *Id.*  Newcastle recently changed its name to Drive Shack Inc., but I will refer to it as Newcastle to avoid confusion.  *Id.*

[7]     *Id.* ¶¶ 12, 107.

[8]     *Id.* ¶ 13.

[9]     *Id.* ¶¶ 13, 90.

[10]     *Id.* ¶ 13.

[11]     *Id.* ¶¶ 42, 44.

party FIG Corp. is the general partner of FOE I; FIG Corp. is a wholly owned subsidiary of Fortress.[12]

Defendant Fortress is an asset-based investment management firm that was founded in 1998 and went public in 2007.[13] By the close of 2014, Fortress had $67.5 billion assets under management ("AUM"), and $70.5 billion AUM by the close of 2015.[14] Fortress's 2014 and 2015 financial disclosure documents reported 100% of the income attributable to FIG and FOE I in Fortress's income calculations.[15] Fortress, its affiliates, and principals held a 7.4% and 5.5% interest in New Residential's common stock on a fully diluted basis by the close of 2014 and 2015, respectively.[16] Even with this minority equity stake, Plaintiff alleges Fortress controls New Residential through (1) its control of FIG Corp, FOE I, and FIG; (2) certain of New Residential bylaws; (3) certain articles of New Residential's certificate of incorporation; and (4) New Residential's board composition.[17]

---

[12]     *Id.* ¶ 44.

[13]     *Id.* ¶¶ 46, 52.

[14]     *Id.* ¶ 46.

[15]     *Id.* ¶ 54.

[16]     *Id.* ¶ 58.

[17]     *Id.* ¶¶ 54-57.

6

Defendant Wesley R. Edens is a founder, principal, and co-chairman of Fortress.[18] Edens owns 22.6% of the Class A shares of Fortress and 37.2% of its Class B shares.[19] Fortress paid Edens compensation of $4,022,688 in 2014 and $13,405,669 in 2015.[20] Additionally, Edens is chairman of the Newcastle board and former chairman of Nationstar Mortgage Holdings, Inc. ("Nationstar").[21] He is a director of both FIG and FIG Corp., and he is a beneficial owner of FOE I.[22] Edens served as a director and chairman of New Residential from its inception in 2013 until he resigned in May 2016.[23] As of April 2, 2015, Edens owned 6.4% of New Residential's outstanding stock.[24] As of April 1, 2016, he owned 3.3% of New Residential's outstanding stock.[25]

---

[18] *Id.* ¶ 15.

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 18. Fortress and Fortress's private-equity funds own 75% of Nationstar. *Id.* ¶ 2.

[22] *Id.* ¶¶ 16-17.

[23] *Id.* ¶ 14.

[24] *Id.* ¶ 17.

[25] *Id.*

Defendant Michael Nierenberg has been a director and the Chief Executive Officer of New Residential since November 2013.[26] He replaced Edens as chairman of the New Residential board in May 2016.[27] He is also a managing director at Fortress.[28]

Defendant Alan L. Tyson has been a director of New Residential since April 2013.[29] He is chairman of the Compensation Committee and serves on the Audit Committee, as well as the Nominating and Corporate Governance Committee.[30] New Residential paid Tyson compensation of $125,009 in 2014 and $150,000 in 2015.[31] He also serves on the Newcastle board, for which he received compensation of $135,000 in 2014 and $125,000 in 2015.[32] The Complaint alleges that Tyson is retired and that his service on these two boards is his only source of employment.[33]

---

[26]     *Id.* ¶ 37.

[27]     *Id.*

[28]     *Id.* ¶ 38.

[29]     *Id.* ¶ 39.

[30]     *Id.*

[31]     *Id.*

[32]     *Id.* ¶ 40.

[33]     *Id.* ¶ 41.

Defendant David Saltzman has been a director of New Residential since April 2013, and he serves on its Compensation Committee.[34] New Residential paid Saltzman compensation of $125,004 in 2014 and $150,000 in 2015.[35] He also has been the Executive Director of the Robin Hood Foundation since 1989.[36] Michael Novogratz—who was a Fortress principal until January 2016—allegedly is "a significant donor to th[at] foundation."[37] Before Saltzman joined the Robin Hood Foundation, Saltzman worked for New York City's Board of Education, Department of Health, and Department of Social Services.[38] Plaintiff contends that "his employment background indicates he has not accumulated great wealth."[39]

Defendant Kevin J. Finnerty has been has been a director of New Residential since April 2013.[40] He serves on its Audit Committee, the Compensation Committee, and the Nominating and Corporate Governance Committee.[41] New

---

[34]     *Id.* ¶ 34.

[35]     *Id.*

[36]     *Id.* ¶ 35.

[37]     *Id.*

[38]     *Id.* ¶ 36.

[39]     *Id.*

[40]     *Id.* ¶ 19.

[41]     *Id.*

9

Residential paid Finnerty compensation of $125,009 in 2014 and $150,000 in 2015.[42] Finnerty also has been involved with Fortress for nearly twenty years.[43] Finnerty has served on the board of Newcastle Investment Holdings LLC ("Newcastle LLC")—the predecessor of Newcastle—since its inception in 1998.[44] At Newcastle, he has served on the board since 2005, and he has served on its Audit Committee, Nominating and Corporate Governance Committee, and Compensation Committee.[45] Finnerty received $125,000 in compensation from Newcastle in both 2014 and 2015.[46]  In 2009, Finnerty received a $500,000 loan from Edens and a $500,000 loan from Randal A. Nardone (another principal, director, and officer of Fortress).[47] Finnerty apparently repaid the two loans in 2015.[48] Plaintiff alleges that the loans were unsecured and interest-free.[49]

---

[42]    *Id.*

[43]    *Id.* ¶ 21.

[44]    *Id.* While the Complaint states that "Newcastle LLC was substantially liquidated in June 2013, its funds were distributed and it was cancelled on June 29, 2015," it is unclear when Finnerty's service on the Newcastle LLC board ended. *Id.*

[45]    *Id.* ¶ 20.

[46]    *Id.*

[47]    *Id.* ¶ 23.

[48]    *Id.* ¶ 24.

[49]    *Id.* ¶ 23.

Defendant Douglas L. Jacobs has been a director of New Residential since June 2013.[50] He currently serves as the chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.[51] New Residential paid Jacobs compensation of $135,004 in 2014 and $160,000 in 2015.[52] Jacobs has been a director of Fortress since February 2007, and he serves on Fortress's Audit Committee and Compensation Committee.[53] He also is a director of Springleaf Holdings, Inc. ("Springleaf"), chairman of its Audit Committee, and member of its Compliance Committee.[54] "Fortress and its funds" allegedly own a majority equity stake in Springleaf, and Springleaf is managed by FIG.[55] At the time Plaintiff filed its Complaint, Jacobs held approximately 200,000 Class A shares of Fortress stock, but fewer than 15,000 shares of New Residential stock.[56]

---

[50] *Id.* ¶ 27.

[51] *Id.*

[52] *Id.*

[53] *Id.* ¶ 29.

[54] *Id.* ¶ 30.

[55] *Id.* ¶¶ 43, 51.

[56] *Id.* ¶ 29.

Non-party Robert J. McGinnis has been a director on the New Residential board since December 2016.[57] McGinnis serves on the Audit Committee, the Nominating and Corporate Governance Committee, and the Compensation Committee.[58] He served on the HLSS board from October 2011 to October 2015, and he served as its chairman from January to October 2015.[59] While chairman of HLSS, he explained in a letter to HLSS stockholders in September 2015 that the HLSS board unanimously approved the HLSS/New Residential merger, and that it was "fair to, and in the best interests of, HLSS and HLSS's shareholders."[60] McGinnis also received a portion of the merger consideration in exchange for his 18,000 HLSS shares.[61] Lastly, upon joining the New Residential board, he received continuing rights to indemnification, advancement, and exculpation from liabilities for conduct during his service on the HLSS board.[62]

---

[57]     *Id.* ¶ 170.

[58]     *Id.*

[59]     *Id.* ¶ 171.

[60]     *Id.* (emphasis omitted).

[61]     *Id.* ¶ 172.

[62]     Pl.'s Answering Br. 27.

12

Non-party Andrew Sloves has been a director on the New Residential board since July 2016.[63] He serves on the Audit Committee, the Nominating and Corporate Governance Committee, and the Compensation Committee at New Residential.[64] Sloves is alleged to be a "significant donor to and involved in the Samuel Waxman Cancer Research Foundation, which Nierenberg chairs and in which both Nierenberg and Edens are significant donors."[65]

Non-party HLSS is a publicly traded Cayman Island exempted company that invests in MSRs and Excess MSRs.[66] HLSS appears to have no ties to Fortress or anyone on the New Residential board other than McGinnis.

### B. Pertinent Facts

On February 22, 2015, New Residential and HLSS entered into an Agreement and Plan of Merger (the "Initial Merger Agreement").[67] Under the Initial Merger Agreement, New Residential would acquire approximately 71 million outstanding shares of HLSS stock for approximately $1.3 billion.[68] But on March 18, NASDAQ

---

[63]   Compl. ¶ 178.

[64]   *Id.*

[65]   *Id.* ¶ 179.

[66]   *Id.* ¶ 108.

[67]   *Id.* ¶ 2.

[68]   *Id.* ¶ 127.

13

notified HLSS that it was non-compliant with NASDAQ listing requirements for its failure to timely file its 10-K.[69] On April 6, HLSS formally notified New Residential that HLSS was likely to receive a going-concern qualification unless it entered into an alternative transaction with New Residential.[70] As such, New Residential and HLSS entered into an agreement to terminate the Initial Merger Agreement (the "Termination Agreement").[71] The Termination Agreement also contained a provision whereby New Residential and HLSS mutually released all claims of their stockholders related to the Initial Merger Agreement and the transactions contemplated thereby.[72]

Also on April 6, 2015, New Residential and HLSS entered into the Share and Asset Purchase Agreement (the "Acquisition Agreement"), whereby New Residential purchased "all of the assets of HLSS (except cash) and assumed all liabilities of HLSS except its term loan which was paid off and up to $50 million in Post-Closing Liabilities."[73] New Residential paid HLSS $1,007,156,145.57 in cash and 28,286,980 newly issued shares of New Residential common stock as

---

[69]     *Id.* ¶ 121.

[70]     *Id.* ¶ 122.

[71]     *Id.* ¶ 4.

[72]     *Id.* ¶¶ 4, 116.

[73]     *Id.* ¶ 123.

14

consideration for New Residential's purchase of the assets of HLSS.[74]  HLSS planned to sell the New Residential stock received as consideration in a public offering "as soon as practicable" after the asset purchase.[75]  HLSS would then merge into a New Residential subsidiary, and New Residential would pay an additional $50 million in cash to HLSS stockholders in the merger.[76]  By the end of this series of transactions, the total purchase price for the HLSS assets was approximately $1,441,200,000.[77]

Plaintiff alleges that in connection with New Residential's purchase of the assets of HLSS, Fortress and its affiliates received "large financial benefits," including increased management fees, increased incentive fees, millions of options in New Residential stock, and advantages to the real estate assets of other Fortress-related entities.[78]

## II.    ANALYSIS

Plaintiff alleges that Defendants have harmed New Residential and its stockholders by forcing New Residential to overpay for the assets of HLSS in order

---

[74]     *Id.* ¶ 123.

[75]     *Id.* ¶ 124.

[76]     *Id.* ¶ 126.

[77]     *Id.* ¶ 127.

[78]     *Id.* ¶¶ 6, 129-31.

to provide Fortress and its affiliates with significant benefits. Defendants move to dismiss Plaintiff's derivative claims for failure to make a pre-suit demand.[79]

## A.    Rule 23.1 Standard of Review

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[80]  "Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)."[81]  In order for a stockholder to pursue a derivative action and deprive the board of its decision-making authority regarding the company's litigation assets, Court of Chancery Rule 23.1 requires stockholders to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the

---

[79]    Plaintiff purports to bring a direct breach of fiduciary duty claim in Count I. In my First Opinion, I concluded that Count I asserts a derivative claim under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). Plaintiff raises no additional facts to change my analysis. *Chester Cnty. Emps.' Ret. Fund*, 2016 WL 5865004, at *6. Nor does the Delaware Supreme Court's holding in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248 (Del. 2016) change my analysis. I thus conclude that Counts I and II are duplicative because they challenge the same underlying behavior and an identical remedy would flow to the corporation. As such, I dismiss Count I, but I consider any alleged misbehavior nominally listed under Count I as derivative under Count II.

[80]    *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (subsequent history omitted).

[81]    *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981).

effort."[82]   Where, as here, the plaintiff has failed to make a pre-suit demand on the board,[83] the court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[84]

The Supreme Court of Delaware articulated the test to analyze demand futility in two seminal cases.  Under *Rales v. Blasband*, a derivative plaintiff must allege particularized facts raising a reasonable doubt that "the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."[85]  The *Rales* test has been said to apply "when a plaintiff does not challenge 'a decision of the board in place at the time the complaint is filed.'"[86]   Under *Aronson v. Lewis*, demand is futile if the plaintiff alleges particularized facts to raise a reasonable doubt that: "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[87]   *Aronson* applies when the

---

[82]   Ct. Ch. R. 23.1.

[83]   Compl. ¶ 167.

[84]   *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Del. 2015).

[85]   634 A.2d 927, 934 (Del. 1993).

[86]   *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 65 (Del. Ch. 2015) (quoting *Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007)).

[87]   473 A.2d at 814.

17

plaintiff challenges an action taken by the board that would consider demand.[88] Fundamentally, however, *Aronson* and *Rales* both "address the same question of whether the board can exercise its business judgment on the corporate behalf."[89] The "[d]emand futility analysis is conducted on a claim-by-claim basis."[90] The Court must accept Plaintiff's particularized allegations of fact as true and draw all reasonable inferences that logically flow from such allegations in Plaintiff's favor.[91]

The Parties' briefings focus on the *Aronson* test, and I do the same for the purpose of my analysis. Under the first prong of *Aronson*, a director is interested if he or she appears "on both sides of a transaction" or expects "to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[92]

> It should be noted, however, that in the absence of self-dealing, it is not enough to establish the interest of a director by alleging that he [or she] received *any* benefit not equally shared by the stockholders. Such benefit must

---

[88]     *Rales*, 634 A.2d at 933-34.

[89]     *In re Duke Energy Corp. Deriv. Litig.*, 2016 WL 4543788, at \*14 (Del. Ch. Aug. 31, 2016); *see In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at \*16 (Del. Ch. May 21, 2013) (explaining the *Aronson* and *Rales* tests are "complementary versions of the same inquiry"); *see also Brett Kandell v. Dror Niv, et al.*, 2017 WL 4334149, at \*11 (Del. Ch. Sept. 29, 2017).

[90]     *Beam v. Stewart*, 833 A.2d 961, 977 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2003).

[91]     *White v. Panic*, 783 A.2d 543, 549 (Del. 2000).

[92]     *Aronson*, 473 A.2d at 812.

18

be alleged to be *material* to that director. Materiality means that the alleged benefit was significant enough "*in the context of the director's economic circumstances*, as to have made it improbable that the director could perform her fiduciary duties to the . . . shareholders without being influenced by her overriding personal interest."[93]

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[94] A lack of independence may be proven by alleging facts that create "a reasonable doubt that a director is so beholden to an interested director that his or her discretion would be sterilized."[95]

Demonstrating demand futility under the second *Aronson* prong—that the challenged transaction was not the exercise of valid business judgment—requires a showing that the situation is one of the "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business

---

[93]  *Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (quoting *In re Gen. Motors Class H S'holder Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)); *see Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *5 (Del. Ch. June 26, 2014) ("[A] 'plaintiff's burden of proof of a director's self-interest in an arms-length third-party transaction should be greater than in a classic self-dealing transaction where a director or directors stand on both sides of a transaction.'") (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 362 (Del. 1993)).

[94]  *Aronson*, 473 A.2d at 816.

[95]  *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006).

judgment, and a substantial likelihood of director liability exists."[96] The second *Aronson* prong applies when the particularized facts are such that it is "difficult to conceive" that a director could have satisfied his or her fiduciary duties.[97]

With respect to the second prong of *Aronson*, "the threat of liability that directors face can be influenced in a substantial way if the corporate charter contains an exculpatory charter provision authorized by 8 *Del. C.* § 102(b)(7)."[98] Where, as here,[99] the company's charter "insulates the directors from liability for breaches of the duty of care, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors"[100] such as a breach of the duty of loyalty.[101]

---

[96] *Aronson*, 473 A.3d at 815.

[97] *See Gifford*, 918 A.2d at 355.

[98] *Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003).

[99] Compl. ¶ 84; Brown Aff. Ex. 16, at 8 ("No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the [Delaware General Corporation Law] as the same exists or may hereafter be amended.").

[100] *Guttman*, 823 A.2d at 501.

[101] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 648 (Del. Ch. 2008).

20

**B.    Demand Is Not Excused Under *Aronson*'s First Prong**

Plaintiff argues that demand is excused as futile because a majority of the New Residential board members are interested or lack independence.[102] At the time Plaintiff filed its Complaint, the following seven directors served on the New Residential board: Kevin J. Finnerty, Douglas L. Jacobs, Robert J. McGinnis, Michael Nierenberg, David Saltzman, Andrew Sloves, and Alan L. Tyson.[103] As explained below, I find that Plaintiff failed to allege particularized facts sufficient to create a reasonable doubt as to the independence of McGinnis, Saltzman, Sloves, and Tyson, which constitutes a majority of the board.

**1.    McGinnis**

Plaintiff argues that McGinnis lacks the independence and disinterest necessary to consider a demand because (1) the HLSS acquisition was "critical for HLSS," and thus he "would decline to pursue any corrective action that could diminish the benefits he previously secured for HLSS" as the former chairman of the HLSS board; (2) he would not want to undermine the "significant reputational benefits among his peers in the mortgage industry and among HLSS's investors" he

---

[102]    Compl. ¶ 167.

[103]    For purposes of this Motion to Dismiss, Plaintiff and Defendants briefed the demand analysis based on the seven-member board in place at the time Plaintiff filed its Complaint under *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006). Notwithstanding this assumption, Plaintiff reserves its right to challenge this issue on appeal. Pl.'s Answering Br. 21.

received from bestowing "a significant benefit upon stockholders who invested in a deeply troubled and failing business;" (3) he received continuing rights to indemnification, advancement and exculpation from liabilities for conduct during his service on the HLSS board; (4) he had a business relationship with Fortress in 2004; and (5) he received a portion of the merger consideration because he held 18,000 HLSS shares.[104]

Plaintiff's allegations fail to raise a reasonable doubt that McGinnis could not exercise his independent and disinterested business judgment in considering a demand for multiple reasons. First, the Complaint does not plead with particularity how McGinnis would suffer reputational harm by bringing demand on behalf of New Residential after he previously concluded that the transaction benefitted HLSS. Nor does Plaintiff explain how his receipt of a portion of the merger consideration would impugn his ability to consider demand. For example, there are no allegations that McGinnis would be at risk of losing such merger consideration.

With respect to Plaintiff's argument regarding McGinnis's receipt of indemnification and exculpation rights, this Court has held that "the receipt of indemnification is not [normally] deemed to taint related director actions with a presumption of self-interest. That is because indemnification has become

---

[104]    Compl. ¶¶ 172-75.

commonplace in corporate affairs, and because indemnification does not increase a director's wealth."[105]

Additionally, Plaintiff's assertion that McGinnis "shared a significant business relationship with Fortress"[106] because he oversaw the securitization of a mortgage loan for Fortress in 2004—over twelve years ago—while working for Greenwich Capital Markets similarly fails to plead with particularity how McGinnis would not be able to use his independent business judgment to consider a demand. Nor does Plaintiff explain how the prior business relationship was "significant." Such vague allegations do not raise a reasonable doubt that McGinnis is disinterested and independent.

### 2. Sloves

Plaintiff alleges that Sloves lacks the requisite independence and disinterest because he (1) is a "significant donor to and involved in the Samuel Waxman Cancer Research Foundation, which Nierenberg chairs and in which both Nierenberg and Edens are significant donors" and (2) has "several years of social connections" with Nierenberg and Edens.[107] But Plaintiff fails to plead any particularized facts

---

[105]    *In re Sea-Land Corp. S'holders Litig.*, 642 A.2d 792, 804 (Del. Ch. 1993), *aff'd sub nom. Sea-Land Corp. S'holder Litig. v. Abely*, 633 A.2d 371 (Del. 1993).

[106]    Compl. ¶ 177; Pl.'s Answering Br. 27.

[107]    Compl. ¶ 179.

regarding these "several years of social connections" to infer that Sloves had a long-standing, close "personal friendship"[108] with either Nierenberg or Edens that would impugn his independence.

Similarly, Plaintiff fails to plead any particularized facts to indicate how or why Nierenberg's and Eden's involvement in the Samuel Waxman Cancer Research Foundation had any influence on Sloves during the relevant time period. For example, Plaintiff vaguely asserts that Sloves, Nierenberg, and Edens are "significant donors," but Plaintiff does not provide details regarding their contributions to the charity that might illuminate Plaintiff's understanding of the term "significant."[109] Because the Complaint lacks any particularized details that might suggest this is something more than a "thin social-circle friendship,"[110] Plaintiff fails to create a reasonable doubt as to Sloves's independence.[111]

---

[108] *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1021-22 (Del. 2015).

[109] Compl. ¶ 179.

[110] *Sanchez,* 124 A.3d at 1022.

[111] *Compare In re Goldman Sachs Gp., Inc. S'holder Litig.*, 2011 WL 4826104, at *9 (Del. Ch. Oct. 12, 2011) ("Crucially, the Plaintiffs fail to provide any information on how the amounts given influenced Bryan's decision-making process. Because the complaint lacks such particularized details, the Plaintiffs have failed to create a reasonable doubt as to [director] Bryan's independence."), *with Off v. Ross*, 2008 WL 5053448, at *11 (Del. Ch. Nov. 26, 2008) ("Ross's substantial donation [of $100 million] raises considerable doubt as to the independence of Dolan. . . . [T]he donation of such a prodigious sum coupled with the fact that Ross became the eponym of the benefiting institution calls into question the independence of Defendant Dolan.").

### 3. Saltzman

Plaintiff alleges that Saltzman lacks the requisite independence and disinterest because he has been the Executive Director of the Robin Hood Foundation, a charitable organization to which Novogratz (a retired Fortress principal) is a "significant donor."[112] I reject this argument for the same reason I rejected such allegations Plaintiff made with respect to Sloves.

Additionally, Plaintiff contends that the compensation Saltzman receives as a New Residential director is material to him because he worked for New York City's Board of Education, Department of Health, and Department of Social Services before joining the Robin Hood Foundation, and thus "his employment background indicates he has not accumulated great wealth."[113] But as this Court explained in *In re Walt Disney*, to find that a director lacks independence because he or she is not wealthy would "discourage the membership on corporate boards of people of less-than extraordinary means. Such 'regular folks' would face allegations of being dominated by other board members, merely because of the relatively substantial compensation provided by the board membership compared to their outside

---

[112]    Compl. ¶ 35.

[113]    *Id.* ¶ 36.

salaries."[114] And "I am especially unwilling to facilitate such a result." [115] As such, Plaintiff's allegations are insufficient to raise a reasonable doubt that Saltzman is interested or lacks independence.

### 4. Tyson

Plaintiff alleges that Tyson lacks independence because he received $125,009 in 2014 and $150,000 in 2015 for his service on the New Residential board, and $135,000 in 2014 and $125,000 in 2015 for his service on the Newcastle board.[116] But Tyson's compensation from these two boards is insufficient to challenge independence because "[u]nder *Aronson*, receiving reasonable compensation for serving as a director for one other company related to an interested director, without more, will usually not be enough to create a reasonable doubt as to director independence."[117]

Plaintiff argues that it has satisfied the requisite "more" because Tyson is retired, and "the compensation from those board seats is a material part of his income."[118] But Plaintiff has not articulated any reason why this Court should

---

[114] *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d 342, 360 (Del. Ch. 1998), *aff'd in part and rev'd in part sub nom. Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[115] *Id.*

[116] Compl. ¶¶ 39-40.

[117] *Kahn v. Portnoy*, 2008 WL 5197164, at *13 (Del. Ch. Dec. 11, 2008).

[118] Compl. ¶ 41.

assume the materiality of this income to Tyson other than the fact that he is retired. A ruling in Plaintiff's favor with respect to Tyson essentially would be a blanket determination that all retired board members lack independence; I decline to adopt such a rule. As the Delaware Supreme Court has held, "allegations of payment of director's fees, without more, do not establish any financial interest."[119]

Lastly, Plaintiff seeks to cast doubt on Tyson's independence by arguing that Tyson is reliant upon a Fortress-controlled Nominating and Corporate Governance Committee for his nomination to the New Residential board.[120] I disagree. The Nominating and Corporate Governance Committee is comprised on Finnerty, Jacobs, McGinnis, Sloves, and Tyson; I have already determined that McGinnis, Sloves, and Tyson are independent, which constitutes a majority of Nominating and Corporate Governance Committee.

In conclusion, Plaintiff fails to raise a reasonable doubt that a majority of the board is independent or disinterested for purposes of demand futility under Rule 23.1; I now turn to the second prong of *Aronson*.

---

[119]   *In re Walt Disney Co. Deriv. Litig.*, 731 A.2d at 360 (citing *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988)).

[120]   Pl.'s Answering Br. 25.

## C. Demand Is Not Excused Under *Aronson*'s Second Prong

Plaintiff articulates two bases to establish that demand is excused as futile under the second prong of *Aronson*. First, Plaintiff asserts that demand would be futile because the entire fairness standard of review applies to the challenged transactions since Fortress allegedly is a controlling stockholder of New Residential.[121] But even if I were to determine that Fortress is a controlling stockholder and is interested in the challenged transactions—which I need not determine—the potential resulting application of the entire fairness standard of review does not automatically render demand futile. To hold otherwise would mean that demand is futile "as a matter of law whenever a transaction between a corporation and its putative controlling stockholder implicates the entire fairness standard."[122] And while this argument has some "superficial appeal, it is inconsistent with controlling authority" in this jurisdiction.[123] As this Court explained in *Baiera*,

---

[121]    Compl. ¶ 182; Pl.'s Answering Br. 37.

[122]    *Baiera*, 119 A.3d at 65.

[123]    *Id.* at n.121 ("Given that the second prong of *Aronson* asks simply whether 'the challenged transaction was otherwise the product of a valid exercise of business judgment,' *Aronson*, 473 A.2d at 814, it is understandable how one might find that test to be satisfied whenever entire fairness review might be triggered, irrespective of the circumstances triggering such review or the nature of the claims to which such review might apply. The sole authority on which Plaintiff relies consists of a transcript ruling that appears to endorse this approach. I decline to follow this ruling because it is inconsistent in my opinion with controlling Supreme Court precedent . . . .").

28

the potential that the entire fairness standard may govern Plaintiff's breach of fiduciary duty claim against [] an alleged controlling stockholder [] does not remove that claim, or any of the other derivative claims [], from the purview of the Demand Board to decide for themselves under 8 *Del. C.* § 141(a) whether to exercise the Company's right to bring such a claim. The focus instead, as explained in *Aronson* and repeated in *Beam*, is on whether Plaintiff's allegations raise a reasonable doubt as to the impartially of a majority of the Demand Board to have considered such a demand.[124]

Here, I have already determined that a majority of the board is independent and disinterested; thus, Plaintiff fails to raise a reasonable doubt as to the impartiality of a majority of the board to have considered such a demand.

Second, Plaintiff alleges that the decision of the New Residential board to terminate the Initial Merger Agreement and enter into the Acquisition Agreement and related transactions is not protected by the business judgment presumption because the "terms of the revised HLSS acquisition are 'so egregious on [their] face' that there is 'a substantial likelihood of director liability.'"[125] "A simple allegation of potential directorial liability is insufficient to excuse demand, else the demand requirement itself would be rendered toothless, and directorial control over corporate litigation would be lost."[126] "Where, as here, the corporation's charter includes an

---

[124] *Baiera*, 119 A.3d at 68.

[125] Pl.'s Answering Br. 52 (citing *Aronson*, 473 A.2d at 815).

[126] *Baiera*, 119 A.3d at 62 (citing *Goldman Sachs Gp.*, 2011 WL 4826104, at *18).

29

exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7), a substantial likelihood of liability 'may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.'"[127] Plaintiff's theory to challenge the board's decisions appears to be one of bad faith.

Plaintiff asserts that the board acted irrationally because it "should have extracted a much better price and improved terms compared to the Initial Merger Agreement."[128] This "is precisely the type of 'Monday morning quarterbacking' that this Court routinely rejects as insufficient to establish demand futility."[129] "In the absence of well pleaded allegations of director interest or self-dealing, failure to inform themselves, or lack of good faith, the business decisions of the board are not subject to challenge because in hindsight other choices might have been made instead."[130]

Additionally, Plaintiff focuses on what it believes to be an overpayment of at least $100 million[131] under the subsequent Acquisition Agreement compared to what

---

[127] *Id.* (quoting *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008)).

[128] Compl. ¶ 127; Pl.'s Answering Br. 51, 53.

[129] *Baiera*, 119 A.3d at 65.

[130] *In re Affiliated Computer Servs., Inc. S'holder Litig.*, 2009 WL 296078, at *10 (Del. Ch. Feb. 6, 2009).

[131] The amount Plaintiff alleges that New Residential overpaid differs in various filings. *Compare* Compl. ¶ 127 (alleging it was "nearly $200 million more"), *with* Pl.'s Answering Br. 38 (arguing it was "$100 million more").

was contemplated initially under the Initial Merger Agreement for assets that had become less valuable. Plaintiff tries to plead overpayment by comparing apples to oranges. The Initial Merger Agreement contemplated a payment of $18.25 per share for the approximately 71 million outstanding HLSS shares,[132] totaling roughly $1.3 billion in cash, plus the "assum[ption] [of] all the . . . debts and liabilities" of HLSS.[133] This would include the assumption of HLSS's $344 million term loan. The threat of a going concern qualification threw a wrench into the process, which would have "result[ed] in a default by HLSS on its term loan and its mortgage loan repurchase and advance financing facilities."[134] The Parties then altered the deal structure into a stock and asset purchase, under which HLSS would first "repay[] . . . in full . . . [the $344 million] Term Loan,"[135] only after which New Residential would transfer roughly $1 billion in cash and 28.3 million New Residential shares[136] and assume a number of specified liabilities.[137] This $1 billion in cash includes roughly $385 million for "HLSS Seller Financing," which appears to correlate with

---

[132] Brown Aff. Ex. 17, at Recitals.

[133] *Id.* § 1.04.

[134] Compl. ¶ 121.

[135] Amato Aff. Ex. A, at § 2.01.

[136] *Id.* § 2.02.

[137] *Id.* § 1.04.

31

the value of HLSS's term loan repayment and any associated prepayment penalties.[138] The total consideration paid for HLSS—which no longer had a term loan for New Residential to assume—was $1.49 billion.[139] Plaintiff seeks to compare the equity purchase price in the initial scenario with the total consideration actually paid for the entire HLSS enterprise, which now lacked a $344 million liability in its term loan; these are inapposite. Thus, I am not convinced this decision was "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[140]

For both of the aforementioned reasons, I do not find the board's decision to purchase the assets of HLSS to be of the "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."[141] Thus, demand is not futile under *Aronson*'s second prong.

---

[138]    Brown Aff. Ex. 14, at 11.

[139]    Compl. ¶ 127.

[140]    *Baiera*, 119 A.3d at 63.

[141]    *Aronson*, 473 A.2d at 815.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is granted.[142]

**IT IS SO ORDERED**.

---

[142] In Count III, Plaintiff seeks a declaratory judgment "that the Termination Agreement could not and did not release the claims of" New Residential stockholders against HLSS. Compl. ¶ 199. In my First Opinion, I dismissed this same count as unripe because I dismissed Counts I and II without prejudice. *Chester Cnty. Emps.' Ret. Fund*, 2016 WL 5865004, at *13. Plaintiff provides no additional facts or arguments that change my analysis in the First Opinion; thus, Count III is dismissed.